**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

REPUBLICAN NATIONAL COMMITTEE and
NORTH CAROLINA REPUBLICAN PARTY,

*Plaintiffs*,

v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS; KAREN BRINSON BELL, in her
official capacity as Executive Director of the North
Carolina State Board of Elections; ALAN HIRSCH, in
his official capacity as Chair of the North Carolina
State Board of Elections; JEFF CARMON, in his
official capacity as Secretary of the North Carolina
State Board of Elections; STACY EGGERS IV,
KEVIN N. LEWIS, and SIOBHAN O'DUFFY
MILLEN, in their official capacities as members of the
North Carolina State Board of Elections,

*Defendants*,

and

DEMOCRATIC NATIONAL COMMITTEE,

*Intervenor-Defendant*.

Case No. 5:24-cv-547-M-RJ

**THE DEMOCRATIC NATIONAL COMMITTEE'S RESPONSE IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS
(Fed. R. Civ. P. 12(b)(6))**

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................... 1

STATEMENT ............................................................................................................. 2

    A.    Registration And First-Time Voting Requirements ................................. 2

    B.    Citizenship Verification During Voter Registration In North Carolina .................. 3

    C.    Prohibition Of Systematic Removals Of Voters From The Rolls Within 90 Days Of A Federal Election ......................................................... 4

    D.    Litigation Over North Carolina's Prior Voter-Registration Form .......................... 4

    E.    This Litigation .............................................................................................. 5

LEGAL STANDARDS ............................................................................................... 8

ARGUMENT .............................................................................................................. 8

I.    PLAINTIFFS FAIL TO PLEAD A VIABLE CAUSE OF ACTION .................................... 9

    A.    Plaintiffs Have No Private Right Of Action To Prosecute Their Alleged Violation Of HAVA's List-Maintenance Provisions ................................. 9

    B.    The Complaint Does Not Plead Facts Sufficient To Establish A HAVA Violation ......................................................................................... 12

    C.    Even If HAVA Could Be Enforced Through A State-Law Claim, Plaintiffs Do Not Allege A Viable One ................................................ 13

II.    FEDERAL LAW PROHIBITS THE LATE-STAGE VOTER PURGE PLAINTIFFS SEEK ................ 18

    A.    HAVA And The NVRA Each Prohibit Systematic Removal Of Voters Within 90 Days Of A Federal Election ................................................ 18

    B.    Due Process Bars The Relief Plaintiffs Seek ....................................... 21

III.    EQUITABLE PRINCIPLES INDEPENDENTLY BAR ANY RELIEF .............................. 24

    A.    The Doctrine Of Laches Bars Relief .................................................. 24

    B.    Granting Any Late-Stage Remedy Would Violate The Supreme Court's *Purcell* Principle ............................................................................ 26

CONCLUSION .......................................................................................................... 28

**INTRODUCTION**

Just weeks before election day, and with voting already underway, the Republican National Committee and the North Carolina Republican Party ask this Court to purge up to 225,000 registered North Carolinians from the voter rolls—without providing them *any* notice or opportunity to be heard—even though these voters filled out the state's voter-registration form, had their applications (and their eligibility to vote) verified by election officials, and will bring identification to the polls (as state law now requires). Plaintiffs seek this mass disenfranchisement, moreover, based on a data-collection requirement that has nothing to do with voters' eligibility to vote.

Plaintiffs' claims should be rejected. Plaintiffs have no viable cause of action; they ask for relief that would itself violate federal law—including the constitutional right to due process and a statutory ban on removing voters from the rolls shortly before any federal election—and their claim is barred by laches as well as the U.S. Supreme Court's *Purcell* doctrine barring last-minute changes to state election law.

Indeed, this lawsuit is so marred with defects that it is best understood as an effort simply to sow doubt about the integrity of North Carolina's elections. That understanding is reinforced by the fact that, in the same month this lawsuit was filed, Republican organizations flooded courts in states like Michigan, Wisconsin, Pennsylvania, Arizona, and Nevada with similar, baseless requests for courts to disqualify votes cast by registered voters. *E.g.*, Vento, *Republicans Sued 3 Battleground States This Week. Here's What You Need to Know*, The Hill (Sept. 14, 2024), https://tinyurl.com/2a93kv; Morgan & Goudsward, *Even Before Election, Trump, Allies Sue Over Claims That Non-Citizens Might Vote*, Reuters (Sept. 19, 2024), https://tinyurl.com/42jzdfv2; Riccardi, *GOP Lawsuits Set the Stage for State Challenges if Trump Loses the Election*, AP News

1

(Sept. 5, 2024), https://tinyurl.com/4zc9e2vu. Courts are not hesitating to reject these untimely lawsuits. Just a few days ago, for example, Pennsylvania's highest court rejected a last-minute Republican effort to change the voting rules in that state. Ex. 1 (*Republican National Committee v. Schmidt*, No. 108 MM 2024 (Pa. Oct. 5, 2024)). The Court should likewise dismiss this lawsuit with prejudice—and do so swiftly before early voting begins in North Carolina on October 17, so that the election can proceed without the specter of doubt that plaintiffs hope to cast.

## STATEMENT

### A.  Registration And First-Time Voting Requirements

Federal and North Carolina law each impose requirements for voter registration, voting, and maintenance of the voter rolls.

*Federal law.* Under the Help America Vote Act, or HAVA, an application to register to vote in federal elections cannot "be accepted or processed by a State unless" it includes "the applicant's driver's license number" or (if the applicant lacks a valid driver's license) "the last 4 digits of the applicant's social security number." 52 U.S.C. §21083(a)(5)(A)(i). If an applicant has neither a valid driver's license nor a social security number, then "the State shall assign the applicant a number which will serve to identify the applicant for voter registration purposes." *Id.* §21083(a)(5)(A)(ii). Once an applicant completes a registration form, "[t]he State shall determine whether the information provided by" the applicant "is sufficient to meet the requirements" outlined in HAVA, "in accordance with State law." *Id.* §21083(a)(5)(A)(iii).

HAVA imposes additional requirements on applicants who register *by mail* without providing either their driver's license numbers or the last four digits of their social security numbers. Such a registrant must either present a photo ID or another identifying document to vote in person in their first federal election or submit a copy of their photo ID or identifying document to vote in their first federal election by mail. 52 U.S.C. §21083(b)(1)-(3). Voters who do not do

2

so may cast only provisional ballots, *id.* §21083(b)(2)(B), which are not counted unless election officials later determine the voters are "eligible under State law to vote," *id.* §21082(a)(4).

***North Carolina law.*** North Carolina law mirrors many of the HAVA requirements just discussed. For example, when a voter who registered by mail has not previously voted in a federal election, she must present a photo ID or other identifying document to vote in person. N.C. Gen. Stat. §163-166.12(a). The state's election manual, a public record published by the State Board detailing voting-site processes and procedures, calls for election officials to collect this information for "[f]irst-time voters, who at the time of their initial voter registration did not provide their North Carolina driver license number or the last four digits of their Social Security number, or who provided a number that could not be validated." Ex. 2 (*North Carolina Official Election Manual*, §§5.7.3, 8.3.1, https://tinyurl.com/bdeyzdcj). Likewise, a person who registers by mail must, when voting for the first time in a federal election by mail, submit a copy of her photo ID or other identifying document. N.C. Gen. Stat. §163-166.12(b). Those who do not present or submit identification are permitted to cast only provisional ballots. *Id.* §163-166.12(e). Finally, as under HAVA, these requirements do not apply to voters who provided their driver's license or social security numbers on their mailed registration forms. *Id.* §163-166.12(f)(2).

### B.    Citizenship Verification During Voter Registration In North Carolina

Under both the North Carolina Constitution and state statutes, an individual must be "born in the United States" or a "naturalized" citizen to vote in North Carolina. N.C. Const. art. VI, §1; N.C. Gen. Stat. §163-55(a). When registering to vote in the state, therefore, applicants must confirm—and have always had to confirm—that they are U.S. citizens in order to be registered. People who register using the North Carolina form confirm their citizenship by checking the appropriate box for the question asking if the applicant is "a citizen of the United States of America." Ex. 3 (NCSBE, *North Carolina Voter Registration Application* (updated Aug. 2024),

https://dl.ncsbe.gov/Voter_Registration/NCVoterRegForm_06W.pdf); *see also* N.C. Gen. Stat. §163-82.4(e). If the applicant is not a U.S. citizen, the form instructs her "not [to] submit this form" because she is "not qualified to vote." Ex. 3. At the bottom of the form, the applicant must include her signature, which confirms that she has "reviewed the contents of [the] form" and attests that she is "a U.S. citizen." *Id.* The form is clear that "[f]raudulently or falsely completing" it "is a Class I felony" under state law. *Id.*

### C. Prohibition Of Systematic Removals Of Voters From The Rolls Within 90 Days Of A Federal Election

Federal law requires most states to (1) maintain a single authoritative list of voters registered in the state, and (2) conduct "list maintenance" to remove ineligible individuals from the rolls. 52 U.S.C. §21083(a). Under the National Voter Registration Act (NVRA), voters may be removed from the rolls at their request or because of change in residence, criminal conviction, mental incapacity, or death. *Id.* §20507(a)(3)-(4). North Carolina law provides for removal from the voter rolls for largely the same reasons. *See* N.C. Gen. Stat. §163-82.1(c).

At the same time, federal law sharply limits states' ability to remove voters from the rolls shortly before any federal election, providing that states "shall complete, *not later than 90 days prior to the date of a primary or general election for Federal office*, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. §20507(c)(2)(A) (emphasis added); *see, e.g.*, *North Carolina State Conference of NAACP v. Bipartisan Board of Elections & Ethics Enforcement*, 2018 U.S. Dist. LEXIS 134228, at *15-29 (M.D.N.C. Aug. 7, 2018) (applying the NVRA's 90-day removal ban).

### D. Litigation Over North Carolina's Prior Voter-Registration Form

On October 6, 2023, "a concerned citizen" named Carol Snow filed an administrative complaint with the North Carolina State Board of Elections. Compl. (D.E. 1-3) ¶48. The

administrative complaint challenged a prior version of North Carolina's voter-registration form, alleging that that version did "not clearly indicate[]" that "the applicant's driver's license number or last 4 digits of the applicant's social security number[] are [sic] required if one or the other ha[s] been issued to the applicant." Ex. 4 (Admin. Compl. at 1, https://s3.amazonaws.com/dl. ncsbe.gov/State_Board_Meeting_Docs/2023-11-28/Snow%20Amended%20HAVA%20 Complaint.pdf); Ex. 5 (NCSBE, *North Carolina Voter Registration Application* (updated Apr. 2023), https://web.archive.org/web/20230824145321/https://dl.ncsbe.gov/Voter_Registration/ NCVoterRegForm_06W.pdf).

After holding a public meeting in November 2023, during which the administrative complaint was discussed, the State Board issued a written order in December 2023 resolving the complaint. Compl. (D.E. 1-3) ¶51 & nn.3-4. That same month, the board addressed the substance of the complaint by updating North Carolina's voter-registration form to make even clearer that an applicant with a North Carolina driver's license or DMV ID number must provide that number, that an applicant without a number from the DMV must provide the last four digits of her social security number, and that an applicant without any of those numbers must indicate that fact on the form. *See id.* ¶54.

Despite these revisions, Ms. Snow raised similar complaints about the form during public meetings of the State Board in March and April 2024. Compl. (D.E. 1-3) ¶56. Having already updated the form (as just discussed), the board denied her requests for further action. *Id.*

E. **This Litigation**

On August 23, 2024—i.e., months after the events just discussed, and with fewer than 90 days to go before election day—plaintiffs filed this action in Wake County Superior Court. *See* Compl. (D.E. 1-3) at 2. Plaintiffs' lawsuit relates to the same (non-current) version of North Carolina's voter-registration form that was challenged in the October 2023 administrative

complaint.  Specifically, plaintiffs allege that, for an unspecified period of time "[p]rior to December 2023," the State Board "used voter registration forms that failed to collect" driver's license and social security numbers.  Compl. (D.E. 1-3) ¶42.  As the prior version of the form itself shows, however, item #3 contained fields for that information:



Ex. 5 at 1 (yellow highlighting added).  The instructions for the prior version of the form, moreover, directed registrants to provide either a driver's license number or the last four digits of a social security number:



*Id.* at 2 (yellow highlighting added).

The complaint includes two claims.  First, plaintiffs seek a writ of mandamus to address an alleged violation of North Carolina General Statutes §163-82.11(c), which requires the State Board to maintain North Carolina's voter rolls in compliance with HAVA.  Compl. (D.E. 1-3) ¶¶77-88.  Plaintiffs seek mandamus, in other words, for alleged non-compliance with HAVA's list-maintenance provisions.  Second, plaintiffs seek a mandatory injunction to redress an alleged violation of the North Carolina Constitution.  *See id.* ¶¶89-96.  Again, the basis for that purported

6

violation is the State Board's supposed failure to comply with both HAVA and the implementing state statute.  *Id.* ¶¶90-92.  Plaintiffs request "a court-approved plan to be completed no later than September 6" under which "ineligible registrants" will be "remov[ed] … from the state's voter registration lists."  *Id.* at 19.  If "removal is not feasible" before that date, then plaintiffs seek a court order requiring "all individuals who failed to provide necessary HAVA identification information but were still registered to vote under the state's prior registration form, to cast a provisional ballot in the upcoming elections pending" the State Board's "receipt and confirmation of the required HAVA information."  *Id.* at 19-20.

On August 30, the Democratic National Committee (DNC) moved to intervene, attaching its proposed pleading.  D.E. 1-16.  The superior court granted the motion, D.E. 1-18, and the DNC filed its motion to dismiss, answer, and affirmative defenses shortly thereafter, D.E. 1-19.  The State Board subsequently removed the case to this Court.  D.E. 1.  It then moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), D.E. 30, 31, and the Court ordered the DNC to file any brief regarding dismissal by October 7, D.E. 36 at 1.  Plaintiffs subsequently moved to remand this case to the superior court, D.E. 37, 38, a motion the Court has stated it will consider together with the State Board's motion to dismiss, *see* D.E. 39.

Meanwhile, on September 28, 2024, a major disaster declaration was issued in North Carolina in the wake of widespread devastation caused by Tropical Storm Helene.  *See* Ex. 6 (Governor Cooper, *Disaster Declaration Request* (Sept. 27, 2024), https://governor.nc.gov/ expedited-major-disaster-declaration-request/open); Ex. 7 (*President Joseph R. Biden, Jr. Approves North Carolina Disaster Declaration*, White House (Sept. 28, 2024), https://tinyurl.com/mstkxf8a).

## LEGAL STANDARDS

When considering a Rule 12(b)(6) motion to dismiss, a court must accept the complaint's well-pled factual allegations and draw reasonable inferences in the plaintiff's favor, while disregarding unsupported legal conclusions. *Blue Coral, LLC v. West Bend Mutual Insurance Co.*, 533 F.Supp.3d 279, 282 (E.D.N.C. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  To survive a motion to dismiss, the well-pled factual allegations must "'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Those allegations must "'be enough to raise a right to relief above the speculative level'"; in other words, they must "'raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].'"  *Id.* (alteration in *Blue Coral*) (quoting *Twombly*, 550 U.S. at 555-556).  "A speculative claim resting upon conclusory allegations without sufficient factual enhancement cannot survive a Rule 12(b)(6) challenge."  *Id.*  The Court may take judicial notice of matters of public record and consider documents attached to the motion to dismiss that are "integral to the complaint and authentic."  *Secretary of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).  Finally, "affirmative defenses can be considered in resolving Rule 12(b)(6) motions when the facts surrounding the defense are clear from the complaint."  *Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023).

## ARGUMENT

Plaintiffs' case fails many times over.  Plaintiffs enjoy no private right of action to enforce HAVA's list-maintenance provisions, and their attempt to transform their alleged HAVA violations into violations of state law fails to state a claim upon which relief can be granted.  Their request to systematically remove approximately 225,000 voters from the voter rolls shortly before the upcoming election is explicitly prohibited by both HAVA and the NVRA, which bars such

8

removals within 90 days of a federal election. And removing those voters without notice and an opportunity to be heard would violate their constitutional right to due process. Finally, dismissal is warranted both under the doctrine of laches because plaintiffs inexcusably delayed in filing their lawsuit mere weeks before voting was set to begin, and (for the same reason) under the Supreme Court's *Purcell* line of cases.

## I.     PLAINTIFFS FAIL TO PLEAD A VIABLE CAUSE OF ACTION

### A.     Plaintiffs Have No Private Right Of Action To Prosecute Their Alleged Violation Of HAVA's List-Maintenance Provisions

Plaintiffs' case rests on their contention that the State Board violated HAVA by not properly soliciting driver's license or social security numbers from registrants on the registration form that the State Board used before December 2023. Indeed, the complaint expressly labels this "a plain violation of Section 303 of the Help America Vote Act." Compl. (D.E. 1-3) ¶3. But HAVA provides no private right of action to enforce the relevant provisions, leaving judicial enforcement to cases brought by the U.S. Attorney General, and providing private parties a right to seek relief only through state administrative procedures.

In particular, HAVA authorizes the U.S. Attorney General to bring a civil action against any state that violates the relevant statutory provisions. 52 U.S.C. §21111. HAVA also requires states that receive federal funding to "establish and maintain State-based administrative complaint procedures" through which private individuals may complain of a HAVA violation. *Id.* §21112. (The operation of that administrative system is evident here, as the State Board "granted Ms. Snow's request to change the voter registration form moving forward." Compl. (D.E. 1-3) ¶54 (emphasis omitted).) Because Congress's provision of "one method of enforcing a substantive rule … preclude[s] others," *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001), these remedial

9

options are preclusive—meaning that anyone other than the U.S. Attorney General cannot sue to enforce the relevant provisions of HAVA.

Indeed, the Supreme Court has rejected a similar attempt by private parties to enforce one of those provisions. Citing *Alexander*, the Court held that the Ohio Republican Party was "not … likely to prevail on the question whether Congress has authorized the District Court to enforce" HAVA's requirements "in an action brought by a private litigant." *Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 & n.* (2008) (per curiam) (quoting provision now codified at 52 U.S.C. §21083(a)(5)(B)). Multiple federal appellate and district courts have reached the same conclusion: The list-maintenance requirements HAVA places on the states may not be enforced privately to remove registered voters from the rolls. *E.g.*, *American Civil Rights Union v. Philadelphia City Commissioners* (*ACRU*), 872 F.3d 175, 184 (3d Cir. 2017); *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019); *Wisconsin Voter Alliance v. Millis*, 2024 U.S. Dist. LEXIS 44025, at *17 (E.D. Wis. Mar. 13, 2024). Though the Fourth Circuit has not directly addressed the question, the circuits that have (the Third and Eleventh) have found no privately enforceable right in this context. *ACRU*, 872 F.3d at 184; *Bellitto*, 935 F.3d at 1202. The DNC knows of no case holding that a private party can enforce HAVA's list-maintenance requirements.

Where courts have found other provisions of HAVA privately enforceable, they have done so not by implying a right of action, but under 42 U.S.C. §1983—in cases brought by or on behalf of voters whom a state threatens to *deprive* of individual rights guaranteed by HAVA, such as the entitlement not to be arbitrarily removed from voter rolls, *see Colón-Marrero v. Vélez*, 813 F.3d 1, 22 (1st Cir. 2016), or "the right to cast a provisional ballot," *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 572 (6th Cir. 2004) (per curiam); *see also Voto Latino v. Hirsch*, 2024 U.S. Dist. LEXIS 11180, at *44 (M.D.N.C. Jan. 21, 2024) (listing cases). The complaint here

never invokes section 1983, no doubt because that provision is inapplicable, as plaintiffs seek to *deny* voters the rights HAVA guarantees. Congress has not authorized plaintiffs to use HAVA's list-maintenance provisions as a sword against the very voters HAVA is meant to protect.

Plaintiffs' scattered references to state statutes implementing HAVA do not supply the missing cause of action. For example, although their complaint refers (¶¶29, 31) to North Carolina's statute establishing a statewide voter-registration list, plaintiffs acknowledge (*id.* ¶62) that that statute is co-extensive with HAVA: It requires the State Board to "develop and implement a statewide computerized voter registration system" and to update the voter-registration list "to meet the requirements of section 303(a)" of HAVA. N.C. Gen. Stat. §163-82.11(c). Like the State Board, the DNC is unaware of any court "ever recogniz[ing] a cause of action for violations of that state statute." D.E. 31 at 11. The other North Carolina statute plaintiffs cite, meanwhile (Compl. (D.E. 1-3) ¶46), likewise references HAVA's requirements, stating that "[t]he form required by" North Carolina General Statutes §162-82.3(a) "shall request the applicant's … [d]rivers license number or, if the applicant does not have a drivers license number, the last four digits of the applicant's social security number," N.C. Gen. Stat. §163-82.4(a)(11).[1]

However plaintiffs label it, then, their claim is under HAVA. That pleads them "out of court," *ACRU*, 872 F.3d at 184, because Congress has not authorized any court to interfere with HAVA's exclusive enforcement mechanisms at the behest of a private plaintiff, "'no matter how desirable that might be as a policy matter, or how compatible with the statute,'" *Bellitto*, 935 F.3d at 1202. The complaint should therefore be dismissed with prejudice. *See, e.g.*, *American Civil*

---

[1] Plaintiffs' passing reference to a "chilling effect on North Carolinians' right to vote in free and fair elections" under Article I, §10 of the North Carolina Constitution (Compl. (D.E. 1-3) ¶71) is vague and inadequately pled.

*Rights Union v. Philadelphia City Commissioners*, 2016 U.S. Dist. LEXIS 122052, at *13 (E.D. Pa. Sept. 9, 2016), *aff'd*, 872 F.3d at 187.

**B.     The Complaint Does Not Plead Facts Sufficient To Establish A HAVA Violation**

Even if there were a private right of action, dismissal would still be required.  As relevant here, HAVA imposes two obligations on North Carolina officials: to collect certain information from voters, and to require that some first-time voters verify their identities at the polls.  Plaintiffs have not plausibly alleged a violation as to either category.

Plaintiffs allege (Compl. (D.E. 1-3) ¶¶43-44) that the State Board violated 52 U.S.C. §21083(a)(5)(A) by accepting completed voter-registration applications that did not provide either a driver's license or social security number.  But HAVA contains an exception for the provision of such information:  "If an applicant for voter registration for an election for Federal office has not been issued a current and valid driver's license or a social security number," then "the State shall assign the applicant a number which will serve to identify the applicant for voter registration purposes."  *Id.* §21083(a)(5)(A)(ii).  All that is required when a registrant lacks either a driver's license or social security number, then, is that the state assign that voter a number.  The complaint contains no allegation that the Board failed to assign an identifying number to any—let alone all— of the applicants who did not provide such information when registering with the prior form.

Nor is there any allegation in the complaint that, for voters who register by mail, North Carolina fails to comply with 52 U.S.C. §21083(b), which requires that such voters provide identifying documents when they first vote.  To the contrary, North Carolina law *requires* first-time voters who registered by mail to present a photo or HAVA ID when voting in order to avoid having to cast a provisional ballot, N.C. Gen. Stat. §163-166.12, and the State Board's guidance is consistent with that mandate, Ex. 2, §§5.7.3, 8.3.1.  Because the complaint fails to state a

12

plausible claim for a HAVA violation, dismissal is required. *See Iqbal*, 556 U.S. at 679; *Twombly*, 550 U.S. at 559.

### C. Even If HAVA Could Be Enforced Through A State-Law Claim, Plaintiffs Do Not Allege A Viable One

#### 1. Plaintiffs have not alleged a viable claim for mandamus

Plaintiffs' plea (Compl. (D.E. 1-3) ¶¶77-88) for a writ of mandamus to address an alleged violation of a state law requiring compliance with HAVA, N.C. Gen. Stat. §163-82.11(c), is not a plausible ground for relief. Mandamus allows a court to order state officers to perform mandatory ministerial duties. *In re T.H.T.*, 362 N.C. 446, 453-454, 665 S.E.2d 54, 59 (2008). To obtain mandamus relief, the petitioner must show: (1) it has "'a clear legal right to the act requested'"; (2) the defendant has "'a legal duty to perform the act requested'"; (3) performance is "'ministerial,'" not discretionary; (4) the defendant neglected or refused to perform the act requested, and the time to do so has expired; and (5) there is no "'alternative, legally adequate remedy'" available to the petitioner. *Morningstar Marinas/Eaton Ferry, LLC v. Warren County*, 368 N.C. 360, 364, 777 S.E.2d 733, 736 (2015). Plaintiffs cannot meet these requirements here.

a. As to the first factor, plaintiffs have no "clearly established" right to relief, *T.H.T.*, 362 N.C. at 453, 665 S.E.2d at 59. "[C]ourts may only issue mandamus to enforce established rights, not to create new rights." *Id.* Mandamus, that is, "will not be issued to enforce an alleged right which is in question." *Moody v. Transylvania County*, 271 N.C. 384, 390, 156 S.E.2d 716, 720 (1967). Applying these standards leaves no doubt that mandamus is not available here. HAVA provides no private cause of action, *supra* §I.A, and plaintiffs have failed to allege facts sufficient to establish a HAVA violation, *supra* §I.B. As set forth below, moreover, HAVA and the NVRA affirmatively bar the relief that plaintiffs seek, *infra* §II.A, as do the equitable doctrine

13

of laches and the *Purcell* principle, *infra* §III.  These myriad obstacles preclude a conclusion that plaintiffs have any clear right to relief.

b.    As to the second mandamus factor, plaintiffs have not shown that the State Board has a clear duty to prevent voting based on alleged deficiencies in voters' registration forms after those voters' eligibility has been verified.  And even if the State Board were prohibited from accepting up to 225,000 voter-registration forms, Compl. (D.E. 1-3) ¶¶42-57, "it is not the office of mandamus to redress a past wrong," *Sutton v. Figgatt*, 280 N.C. 89, 93, 185 S.E.2d 97, 100 (1971).  A writ of mandamus, in other words, cannot compel the State Board to retroactively impose requirements on completed voter-registration forms.  Instead, plaintiffs must show that the State Board has a clear duty to *remove* up to 225,000 North Carolina voters from the voting rolls or to force them to cast only provisional ballots.  They cannot do so, because federal law does not require the State Board to remove voters from the rolls based on deficiencies in their forms—and in fact prohibits that so close to an election.  *Infra* §II.A.  Plaintiffs point to North Carolina General Statutes §163-82.11(c) as establishing a duty (*e.g.*, Compl. (D.E. 1-3) ¶58), but that provision simply incorporates federal law, which again establishes no such duty.

A closer look at the State Board's actual legal duties confirms the point.  North Carolina's list-maintenance statute, like its federal equivalent, requires the State Board to "remove the names of ineligible voters," i.e., non-U.S. citizens, convicted felons, minors, out-of-state residents, the deceased, and so on.  N.C. Gen. Stat. §163-14(a)-(d); N.C. Const. art. VI, §§1, 2(1)-(3).  Plaintiffs have not alleged, and cannot allege, that the 225,000 voters they seek to disenfranchise are ineligible under that statute.  And even if this Court could order the State Board to retroactively reject 225,000 voter-registration forms, the solution would not be disenfranchisement or mandatory use of provisional ballots.  Under state law, affected voters would be entitled to notice

and an opportunity to supply missing information. N.C. Gen. Stat. §163-82.4(f). They would vote provisional ballots only if they failed to correct the information before election day. *Id.* And their provisional ballots would still count so long as they supplied all necessary information to their county board of elections by 5:00 p.m. on November 14. *Id.* The State Board's duty is to follow these removal provisions, not to create new removal procedures that the legislature never enacted.

If removal is not feasible, plaintiffs' alternative requested relief is that voters who registered without providing the requisite information on their registration forms be required to vote provisional ballots (i.e., ballots that will not be counted unless the board can verify the voter's eligibility with its own data). Compl. (D.E. 1-3) at 19-20; N.C. Gen. Stat. §163-166.11. But again, plaintiffs cannot point to any legal duty for the State Board to require provisional voting under these circumstances. To the contrary, both federal and state law require voters to cast provisional ballots only if they do not present HAVA-compliant ID at the polls or their name is absent from the polling place's list of registered voters. *See* 52 U.S.C. §§21083(b)(2)(B), 21082(a); N.C. Gen. Stat. §163-166.12(e). Voters, in other words, have a right to cast a regular, non-provisional ballot that they can be sure will be counted by supplying the requisite identification when they show up to vote. Indeed, HAVA treats provisional voting as a "[f]ail-safe" to ensure voters denied a regular ballot may still cast some type of ballot, 52 U.S.C. §21083(b)(2)(B), not a substitute for such a ballot—as some jurisdictions make plain, provisional ballots are really "questioned ballot[s]," *Nageak v. Mallott*, 426 P.3d 930, 936 (Alaska 2018). Plaintiffs' alternative relief would impermissibly eliminate the right to cast regular ballots by bringing HAVA-compliant ID to the polls—a right codified in both federal and state law. The State Board's legal duty is to follow the law on provisional voting, not to expand it beyond the Congress's intended reach.

15

Plaintiffs' inability to show a legal duty for the State Board to perform the requested relief by itself makes mandamus inappropriate.

c.       Assuming plaintiffs' posited duty exists, plaintiffs must also show (under the third mandamus factor) that it is "ministerial" and does "not involve the exercise of discretion," *T.H.T.*, 665 S.E.2d at 59.  Performance of a duty is discretionary if it requires "personal deliberation, decision and judgment."  *Meyer v. Walls*, 347 N.C. 97, 113-114, 489 S.E.2d 880, 889 (1997).  Duties are ministerial, by contrast, when they are "absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed and designated facts."  *Id.*

Plaintiffs' prayer for relief asks for court interference with several of the State Board's discretionary duties, requesting review and approval of board plans to "develop, implement, and enforce practices and policies to ensure compliance" with state and federal law; "identify[]" and "remov[e]" "all ineligible registrants"; and in the future, register "only eligible, qualified voters." Compl. (D.E. 1-3) at 19-20.  None of that is remotely "ministerial" or free of discretion.

To the contrary, implementing election laws is expressly within the State Board's discretion.  As the North Carolina Supreme Court has explained, the General Assembly "has, in the exercise of its authority to delegate the making of interstitial policy decisions to administrative agencies, given decision making responsibilities to the … State Board."  *Cooper v. Berger*, 370 N.C. 392, 416 n.11, 809 S.E.2d 98, 113 n.11 (2018).  In particular, the General Assembly has delegated to the Board "general supervision over the primaries and elections" and the power to "advise[s] county boards of elections as to the proper methods of conducting" elections, N.C. Gen. Stat. §163-22(a), (c), and to design list-maintenance procedures, *id.* §163-82.14(a).  The Board exercises discretion in (among other things) designing list-maintenance strategies and carrying out individual voter removal through quasi-judicial "challenges" that require collecting and evaluating

evidence. *Id.* §§163-14(a), 163-85, 163-86, 163-88, 163-89. This broad discretion is another reason mandamus relief is unavailable.

### 2. Plaintiffs have not alleged a viable claim for violation of the North Carolina Constitution

To be viable, a claim under the North Carolina Constitution must be "plausible … given the facts presented and the current law (or [seek] a reasonable and logical extension or modification of the current law)." *Deminski ex rel. C.E.D. v. State Board of Education*, 377 N.C. 406, 413, 858 S.E.2d 788, 793 (2021). Here, neither the law nor the facts are on plaintiffs' side.

The North Carolina Constitution protects the "'right to vote *on equal terms*,'" meaning that "each vote must have the same weight." *Harper v. Hall*, 384 N.C. 292, 364-365, 886 S.E.2d 393, 440 (2023); *see also State ex rel. Martin v. Preston*, 325 N.C. 438, 455, 385 S.E.2d 473, 481 (1989) ("once the right to vote is conferred, the *equal* right to vote is a fundamental right"). Because plaintiffs have not alleged that their members' votes will be weighted differently than anyone else's votes, plaintiffs have failed to state a constitutional claim.

Plaintiffs' actual claim—that their members' votes will be *diluted* if the 225,000 North Carolinians they seek to disenfranchise are allowed to vote—is not recognized under North Carolina law. As the North Carolina Supreme Court has explained, "a claim of vote dilution allegedly based on one's affiliation with a political party does not raise a claim" under the North Carolina Constitution. *Harper*, 384 N.C. at 364-365, 886 S.E.2d at 440. This Court should not "create or expand" Article I, § 19 beyond what the North Carolina Supreme Court has previously allowed. *Time Warner Entertainment-Advance/Newhouse Partnership v. Carteret-Craven Electric Membership Corp.*, 506 F.3d 304, 314 (4th Cir. 2007).

But even if plaintiffs' constitutional claim were cognizable, plaintiffs have not plausibly alleged that their members' votes *will* be diluted by ineligible registrants' votes. The North

Carolina Constitution sets eligibility requirements: A voter is eligible if he is a U.S. citizen, at least 18 years old, a North Carolina resident, and has not been convicted of a felony (or has had his rights restored post-conviction). N.C. Const. art. VI, §§1, 2(1)-(3). And once a voter who meets these requirements is registered, "his vote will not be rejected" just because "the registration books show that he had not complied with all the minutiae of the registration law." *Woodall v. Western Wake Highway Commission*, 176 N.C. 377, 97 S.E. 226, 232 (1918). Plaintiffs' bare allegation that some voters are "potentially" ineligible to vote (Compl. (D.E. 1-3) ¶94) is speculative and hence insufficient to state any direct constitutional claim.

## II. FEDERAL LAW PROHIBITS THE LATE-STAGE VOTER PURGE PLAINTIFFS SEEK

### A. HAVA And The NVRA Each Prohibit Systematic Removal Of Voters Within 90 Days Of A Federal Election

1. To protect eligible voters from improper removal, the NVRA precludes states from removing people from the voter rolls as plaintiffs request. Under the NVRA, states "shall complete, not later than 90 days [before] a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. §20507(c)(2)(A). As of this filing, the November 5 elections are only 29 days away, well within the NVRA's 90-day period.

There is no question, moreover, that plaintiffs seek to do exactly what the NVRA prohibits during that 90-day period: "systematically remove the names of ineligible voters from the official lists of eligible voters," 52 U.S.C. §20507(c)(2)(A). In this litigation, plaintiffs have not brought *individualized* challenges against any of the 225,000 registered voters that are "potentially ineligible," Compl. (D.E. 1-3) ¶94. Rather, plaintiffs ask this Court to order the State Board to systematically purge all those voters from the rolls. Specifically, plaintiffs pray for "a court-approved plan" under which the State Board must "identify[] all ineligible registrants and remov[e]

them from the state's voter registration lists." Compl. (D.E. 1-3) at 19. Such a plan falls squarely within the scope of the NVRA's broad phrase "any program." Hence, while plaintiffs ask that voters be removed from the rolls "consistent with … federal law," *id.*, that cannot now be done in the manner they seek (not least because of how long plaintiffs waited to bring this action).

There are good reasons for the NVRA's 90-day ban. As a court in this circuit recently acknowledged when barring a voter purge that violated that ban, the 90-day period reflects a congressional judgment that "'[e]ligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote.'" *North Carolina State Conference of NAACP*, 2018 U.S. Dist. LEXIS 134228, at *18 (quoting *Arcia v. Secretary of State*, 772 F.3d 1335, 1346 (11th Cir. 2014)); *see also Mi Familia Vota v. Fontes*, 691 F.Supp.3d 1077, 1093 (D. Ariz. 2023), *on appeal*, No. 24-3188 (9th Cir.). The NVRA's 90-day removal ban "strikes a careful balance: It permits systematic removal programs at any time except for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest." *Arcia*, 772 F.3d at 1346. Plaintiffs have invited the very risk Congress prohibits states from introducing by filing this late-stage lawsuit (which they could have filed long before Congress's chosen cutoff date, *see infra* §III.A).

The NVRA does contain an exception to the 90-day removal ban, but it does not apply here. The exception states that the 90-day prohibition "shall not be construed to preclude" the "correction of registration records pursuant to this chapter." 52 U.S.C. §20507(c)(2)(B)(ii). The language "this chapter," however, refers to the NVRA, not to HAVA and its voter-registration requirements, which are in a different chapter of the U.S. Code. And the NVRA provides for removal only at the request of the registrant or by reason of criminal conviction, mental incapacity, death, or change in residence. *Id.* §20507(a)(3)-(4). None of that is what plaintiffs seek here,

which is removal based on completion of a registration form that plaintiffs believe was improperly color coded. That relief is not available.

If more were needed, the NVRA requires that any method to remove voters be "uniform, nondiscriminatory, and in compliance with" the Voting Rights Act. 52 U.S.C. §20507(b)(1). That provision is violated when a method for purging voters is overinclusive, "identif[ying] many properly registered citizens as potential noncitizens." *United States v. Florida*, 870 F.Supp.2d 1346, 1350 (N.D. Fla. 2012). Plaintiffs' requested relief constitutes such an overinclusive method, because not every applicant who failed to provide either a driver's license number or a social security number is ineligible to vote. Indeed, plaintiffs concede the point, alleging only that the voters they have targeted for removal are "*potentially* ineligible." Compl. (D.E. 1-3) ¶94 (emphasis added).

Plaintiffs' remand motion hints at a couple of counterarguments, but those are unavailing. First, plaintiffs suggest that removal of each of the potentially 225,000 voters from the rolls would be "the result of an individualized inquiry." D.E. 38 at 11. That understanding of "individualized" would improperly eviscerate the NVRA's 90-day provision. Plaintiffs seek to disqualify a whole class of up to 225,000 voters without explaining any of the facts that led to each voter's supposedly deficient registration form. A court-approved plan for up to 225,000 voters would be "systematic[]," 52 U.S.C. §20507(c)(2)(A), in that it would apply to hundreds of thousands of voters without considering the underlying facts.

Second, plaintiffs' remand motion suggests that the NVRA's 90-day removal ban "would not be implicated … if removal from the voter rolls occurred after the general election." D.E. 38 at 11 n.4. To the extent plaintiffs mean that voters should be allowed to vote but then their registrations might be canceled in between election day and certification of the election—which

would disqualify their votes—that is preposterous.  Under the plain text of the statute, systematic removals are prohibited starting 90 days before the election and lasting through the election.  *See* 52 U.S.C. §20507(c)(2)(A).  The election is not over until the results are certified.  *See* N.C. Gen. Stat. §163-182.15.  Permitting any intervening removals would directly contradict Congress's intent in passing the NVRA to set a cutoff for voters being removed from the rolls well before their votes are counted in the election.  *Supra* pp.19-20.

2.      HAVA likewise prohibits plaintiffs' requested voter purge.  Although the statute provides (with an exception not relevant here) that states must have "a single … computerized statewide voter registration list," 52 U.S.C. §21083(a)(1)(A), and must regularly perform "maintenance" of that list, *id.* §21083(a)(2)(A), HAVA also commands that the maintenance must "be conducted in a manner that ensures that[] … only voters who are not registered or who are not eligible to vote are removed," *id.* §21083(a)(2)(B)(ii).  But as explained, many of the 225,000 voters whom plaintiffs target *are* eligible to vote.  Plaintiffs have suggested no way for the State Board to remove only those "who are not," *id.*  Moreover, HAVA expressly incorporates the NVRA's prohibition on systematic voter removals within 90 days of a federal election, *id.* §21083(a)(2)(A)(i) (incorporating 52 U.S.C. §20507(c)(2)), which again forecloses plaintiffs' requested relief.

## B.      Due Process Bars The Relief Plaintiffs Seek

Removing registered voters from North Carolina's rolls (or disqualifying their already-cast ballots) without providing them notice and an opportunity to be heard would violate their constitutional right to procedural due process, *see* U.S. Const. amend. XIV, §1.  These 225,000 voters submitted the proper version of North Carolina's registration form, had their eligibility verified by election officials, and were told that they are registered to vote in all future elections.

It cannot be that they must be told now—on the eve of a presidential and other elections—that they will be removed from the rolls or prohibited from casting a regular ballot.

Such removals would violate due process because they would constitute "state action" that infringed "'a cognizable liberty … interest'" (the right to vote) using "'constitutionally inadequate'" procedures, *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011). Courts evaluating whether a procedure is "constitutionally" inadequate, *id.*, consider three factors: (1) "the private interest that will be affected;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Here, all three factors support finding a due-process violation.

As to the first, there is no doubt that the private interest is enormously important. Indeed, the Supreme Court has explained that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). It is "preservative of all rights." *United States v. Anderson*, 481 F.2d 685, 699 (4th Cir. 1973). The Fourth Circuit has made the same point more recently, deeming it "beyond dispute that 'voting is of the most fundamental significance under our constitutional structure.'" *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016). If this lawsuit were to proceed, voters risk being improperly removed from the rolls or being made to cast provisional ballots the state may not count. *Supra* §II.B. Either injury threatens the right to vote, which includes voters' right to "cast their ballots" (which removal from the rolls would prohibit)

22

*and* "have them counted" (which being made to cast a provisional ballot threatens). *United States v. Classic*, 313 U.S. 299, 315 (1941); *see supra* pp.15-16.

As to second factor, the relief plaintiffs seek creates a significant risk of erroneous deprivations of the right to vote, because (as explained) many, if not most, of the 225,000 registered voters at issue are in fact eligible to vote. As noted, plaintiffs concede that the voters they target are only "*potentially* ineligible." Compl. (D.E. 1-3) ¶94 (emphasis added). And additional procedures—such as providing voters notice and an opportunity to be heard before removal— would undoubtedly reduce that risk, because voters who are in fact eligible would be able to demonstrate their eligibility. Indeed, the Fourth Circuit has made clear that procedures that do not provide "notice and opportunity to be heard" are generally deficient. *Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141, 145-146 (4th Cir. 2018); *see also Voto Latino*, 2024 U.S. Dist. LEXIS 11180, at *85. North Carolina law recognizes this point, and thus gives voters individual hearings before being purged from the rolls. N.C. Gen. Stat. §§163-85, 163-86. That is the *minimum* process due to them. *E.g.*, *Jones v. Governor of Florida*, 975 F.3d 1016, 1049 (11th Cir. 2020); *Bell v. Marinko*, 235 F.Supp.2d 772, 777 (N.D. Ohio 2002).

As to the third *Mathews* factor, there is no reasonable argument that providing people with notice and an opportunity to be heard before being removed from the rolls would impose an excessive fiscal or administrative burden on the state. There is no such argument because state law *already requires* such notice and opportunity. Again, under North Carolina law, if a registered voter is challenged by another voter as being ineligible, the appropriate county board must hold a hearing on the challenge before removing the voter, providing the voter with notice of the hearing and an opportunity to be heard there. *See* N.C. Gen. Stat. §§163-85, 163-86. In any event, any

23

burden on the state from providing adequate process is far outweighed by the paramount importance of the right to vote.[2]

Confronted with a request comparable to plaintiffs', the chief justice of the Arizona Supreme Court recently rejected an attempt to deny nearly 100,000 voters the ability to vote in state and local elections because they had not provided documentary proof of U.S. citizenship when they registered to vote. *See Richer v. Fontes*, 2024 Ariz. LEXIS 263, at *8 (Ariz. Sept. 20, 2024) (Timmer, C.J.). The chief justice was "unwilling" to "disenfranchise voters en masse" when doing so "is not authorized by state law and would violate principles of due process." *Id.* That was "particularly true" given that (1) it was a "state administrative failure" that led to voters being registered without the requisite proof of citizenship, and (2) there was "so little time remaining before the beginning of the 2024 General Election." *Id.* at *7. Another federal judge in this state similarly rejected such an effort because the "en masse cancellation of voter registrations lacked individualized inquiry into the circumstances of each voter and provided little to no opportunity for improper removals to be corrected." *North Carolina State Conference of NAACP*, 2018 U.S. Dist. LEXIS 134228, at *25. The same conclusion is warranted here.

## III.    EQUITABLE PRINCIPLES INDEPENDENTLY BAR ANY RELIEF

### A.    The Doctrine Of Laches Bars Relief

Laches is an affirmative defense that precludes equitable relief where (1) there has been a "lack of diligence by the party against whom the defense is asserted," and (2) granting relief despite that delay would "prejudice … the party asserting the defense." *Costello v. United States*, 365 U.S. 265, 282 (1961); *accord, e.g.*, *EEOC v. Propak Logistics, Inc.*, 746 F.3d 145, 149 n.5 (4th

---

[2] Removal from the voter rolls without notice and an opportunity to be heard would still violate due process if, instead of the *Mathews* factors, the Supreme Court's *Anderson-Burdick* framework applied here. *See generally Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

Cir. 2014). The "greater the delay, the less … prejudice required to show laches, and vice versa." *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990). Here, both the delay and the prejudice easily suffice to trigger laches.

1. Plaintiffs' lack of diligence in filing this lawsuit is considerable, and in fact astounding, given the relief now sought. Almost a *year* ago, an administrative complaint was filed with the State Board making the same basic claim plaintiffs raise here. Ex. 3 at 1-2. The State Board publicly issued a written order ruling on it in December 2023. *See* Compl. (D.E. 1-3) ¶51. Plaintiffs could have filed their suit shortly after the administrative complaint was raised or after the State Board ruled on the complaint late last year. Instead, plaintiffs waited many months, not suing until August 23 of this year—scarcely two weeks before ballots were scheduled to be distributed throughout North Carolina, *see* N.C. Gen. Stat. §163-227.10(a). The Fourth Circuit has deemed the first laches requirement met where the filing of an eleventh-hour election-related lawsuit was delayed for four months—far less than the delay here. *See Perry v. Judd*, 471 F.App'x 219, 224 (4th Cir. 2012). Excusing that delay, the court explained, "would encourage [others] to wait until the last minute to bring [similar] challenges." *Id.* at 225. The court declined to do so, and this Court should as well.

2. The second element of laches is likewise met here, as the DNC has been prejudiced by plaintiffs' delay in suing. As explained, the relief plaintiffs seek would result in preventing or disqualifying the votes of many North Carolinians who are in fact eligible to vote—people who would have had more time to demonstrate their eligibility (and thereby would have remained on the rolls for the upcoming elections) had plaintiffs sued earlier. Because many of these people are likely to vote for Democratic candidates in November's general election, plaintiffs' delay would, if their relief is granted, prejudice the DNC by hindering its ability to accomplish its mission of

25

getting Democrats elected. Even as to voters among the 225,000 who are not removed, plaintiffs' last-minute complaint threatens to cause confusion that may keep voters away from the polls, again to the prejudice of the DNC given that at least some of the voters plaintiffs target will support Democratic candidates.

In short, the laches requirements are met here. This Court can and should dismiss plaintiffs' complaint on this basis alone. *See Perry*, 471 F.App'x at 228.

### B. Granting Any Late-Stage Remedy Would Violate The Supreme Court's *Purcell* Principle

The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican National Committee v. Democratic National Committee*, 589 U.S. 423, 424 (2020) (per curiam). "Court orders affecting elections" tend to "result in voter confusion and consequent incentive to remain away from the polls" if they are made shortly before an election occurs. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam). This is a "bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled." *Merrill v. Milligan*, 142 S.Ct. 879, 880 (2022) (Kavanaugh, J., concurring).

Both the Fourth Circuit and Supreme Court regularly enforce this rule against "lower court injunctions of state election [procedures] in the period close to an election," *Pierce v. North Carolina State Board of Elections*, 97 F.4th 194, 226 (4th Cir. 2024), especially in a general election year, *see, e.g.*, *Merrill v. People First of Alabama*, 141 S.Ct. 25 (2020); *Andino v. Middleton*, 141 S.Ct. 9 (2020); *Republican National Committee*, 589 U.S. at 424. That is because state election officials "need substantial time to plan for elections," and this need "heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding

26

late, judicially imposed changes to its election … procedures." *Milligan*, 142 S.Ct. at 880-881 (Kavanaugh, J., concurring).

All this is well-known to plaintiffs. The Republican Party has invoked *Purcell* in case after case this year, including as early as May 2024, i.e., *six months* before the election. Ex. 8 (Non-Party Brief of the Republican National Committee et al., *Priorities USA v. Evers*, No. 2024AP164 (Wis. May 3, 2024)). Likewise, the Republican Party invoked *Purcell* in their recent *opposition* to a late-stage voter purge. "[G]iven the proximity to the election," the Arizona Republican Party represented to the Arizona Supreme Court two weeks ago, "it is less likely that voters will stay home than they will show up to vote without knowing that there is any problem with their registration. In other words, U.S. citizen voters who have … consistently participated in state elections without issue are likely to show up at their polling place on November 5 only to learn that they have been disenfranchised by a state government clerical error of which they had no prior knowledge." Ex. 9 (Brief of Arizona Republican Party as Amicus Curiae in Support of Respondent at 10, *Richer v. Fontes*, No. CV-24-0221-SA (Ariz. Sept. 18, 2024)).

These principles—which North Carolina law likewise reflects, *see Pender County v. Bartlett*, 361 N.C. 491, 510, 649 S.E.2d 364, 376 (2007), *aff'd on other grounds sub nom. Bartlett v. Strickland*, 556 U.S. 1 (2009)—preclude the relief plaintiffs seek. Voting is underway in North Carolina. "The election is not merely 'close[],' or even 'imminen[t]'—it is happening *right now*." *Pierce*, 97 F.4th at 227 (emphasis added). The targeted voters, who "'deserve clarity' about their elections," *id.* at 229 (quoting *Wise v. Circosta*, 978 F.3d 93, 96 (4th Cir. 2020) (en banc)), have been registered, and that state action "establishes the status quo" that cannot now be disrupted, *id.* at 209 (quoting *Wise*, 978 F.3d at 98). Indeed, many of the 225,000 registered voters plaintiffs target may have already voted by mail, while others will no doubt do so in the coming days. And

still others will soon head to the polls for early, in-person voting, which begins on the day the Court scheduled for a hearing on the State Board's motion. To change the rules now, after the state has assured voters (perhaps for years in some cases) that they are eligible to vote, or to threaten not to count their ballots, could sow confusion and chaos, undermining public confidence in the election. To make matters worse, the state is reeling from the effects of a natural disaster that only makes it harder for voters in large portions of the state to cast their ballots, *supra* p.8, let alone comply with an onerous, late-stage requirement that they re-prove their eligibility to vote. *Purcell* and its progeny forbid that outcome.

*     *     *

Plaintiffs' last-minute gambit to sow election chaos with a wholly meritless complaint should be rejected—and promptly, so that the election may proceed unimpugned and uninterrupted, and North Carolinians who have long been registered to vote may rest assured in exercising one of our most sacred constitutional rights.

## CONCLUSION

The complaint should be dismissed with prejudice.

28

October 7, 2024                                    Respectfully submitted,

/s/ Seth P. Waxman                                 /s/ Jim W. Phillips, Jr.

SETH P. WAXMAN*                                    JIM W. PHILLIPS, JR.
DANIEL S. VOLCHOK*                                 N.C. BAR NO. 12516
CHRISTOPHER E. BABBITT*                            SHANA L. FULTON
GARY M. FOX*                                       N.C. BAR NO. 27836
JOSEPH M. MEYER*                                   ERIC M. DAVID
JANE KESSNER*                                      N.C. BAR NO. 38118
NITISHA BARONIA*                                   WILLIAM A. ROBERTSON
WILMER CUTLER PICKERING                            N.C. BAR NO. 53589
    HALE AND DORR LLP                              JAMES W. WHALEN
2100 Pennsylvania Avenue N.W.                      N.C. Bar No. 58477
Washington, D.C.  20037                            BROOKS, PIERCE, MCLENDON
Phone: (202) 663-6000                                  HUMPHREY & LEONARD, LLP
Fax: (202) 663-6363                                150 Fayetteville Street
seth.waxman@wilmerhale.com                         1700 Wells Fargo Capitol Center
daniel.volchok@wilmerhale.com                      Raleigh, N.C.  27601
christopher.babbitt@wilmerhale.com                 Phone: (919) 839-0300
gary.fox@wilmerhale.com                            Fax: (919) 839-0304
joseph.meyer@wilmerhale.com                        jphillips@brookspierce.com
jane.kessner@wilmerhale.com                        sfulton@brookspierce.com
nitisha.baronia@wilmerhale.com                     edavid@brookspierce.com
                                                   wrobertson@brookspierce.com
* Local Rule 83.1(e) special appearance.           jwhalen@brookspierce.com

29