# EXHIBIT 9

Andrew Gould (No. 013234)
Drew. C. Ensign (No. 25463)
HOLTZMAN VOGEL BARAN
TORCHINSKY JOSEFIAK PLLC
2555 East Camelback Rd., Ste. 700
Phoenix, Arizona 85016
Telephone: (602) 388-1262
densign@holtzmanvogel.com

*Attorneys for Arizona Republican Party*

## ARIZONA SUPREME COURT

| | |
|---|---|
| Maricopa County Recorder Stephen Richer, in his official capacity, | Arizona Supreme Court No. CV-24-0221-SA |
| Petitioner, | |
| v. | |
| Arizona Secretary of State Adrian Fontes, in his official capacity, | |
| Respondent. | |

## BRIEF OF ARIZONA REPUBLICAN PARTY AS AMICUS CURIAE IN SUPPORT OF RESPONDENT (FILED WITH CONSENT OF THE PARTIES)

HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC

Andrew Gould
Drew C. Ensign
2555 E. Camelback Road, Suite 700
Phoenix, Arizona 85016

*Attorneys for Arizona Republican Party*

# INTEREST OF AMICI

The Arizona Republican Party ("AZ GOP") is a political party in Arizona with over 1.4 million registered voters. AZ GOP's members would be disproportionately affected by the unlawful contraction of the right to vote sought by Petitioner Richer here.[1]

# ARGUMENT

The declaratory relief sought by Petitioner would violate both state and federal law and should be denied for five independent reasons. The governmental failure to enforce state law regarding proof of citizenship must be corrected—but not on the eve of an election where doing so may cause massive voter disenfranchisement and would be unlawful.

## I.    The Relief Would Violate The NVRA

Petitioner's requested declaratory judgment flouts federal statutory law in the form of the National Voter Registration Act ("NVRA"). The NVRA prescribes specific procedures for the removal of ineligible voters from the voter rolls. Section 8 tasks state election administrators with the responsibility to conduct regular voter list maintenance "that makes a reasonable effort to remove the names of

---

[1]  Petitioner and Respondent consent to filing of this brief.

Case 5:24-cv-00547-M-RJ   Document 48-10   Filed 10/07/24   Page 3 of 13

ineligible voters" who are not eligible to vote for certain enumerated reasons. 52 U.S.C. §20507(a)(4). It further limits the bases for removals of registration. *Id.* §§ 20507(a)(3), (4).

Beyond restricting the permissible bases for removal, the NVRA prohibits voter list maintenance at certain times—specifically including now until the November election. A State must complete "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" "not later than 90 days prior to the date of a ... general election for Federal office." *Id.* §20507(c)(2)(A). This period during which systematic removals are prohibited is known as the "NVRA Blackout Period," and this year it began on August 7, 2024.

Notable for its absence from the NVRA's list of permissible reasons for removal is the category of "state government clerical errors"—let alone colossal errors that could diminish the voting rights of nearly 100,00 voters. Voters who have resided in Arizona for three decades or more—and have *never* previously been notified of any issues with their voter registrations—would now be informed that they cannot vote a full ballot without first producing documentary proof of citizenship ("DPOC").

As a result, many voters may not discover the need to provide DPOC until it is too late.

Not only is a coding error on the part of a government agency an invalid reason for attempting to invalidate the registrations of eligible voters (even partially), but the damage is compounded by the fact that Petitioner is attempting to effectuate these removals during the NVRA Blackout Period, when such removals are unlawful. The NVRA thus prohibits the relief sought here.

## II. Petitioner's Requested Relief Would Violate The U.S. Constitution

The declaratory judgment sought by Petitioner violates the First and Fourteenth Amendments under the U.S. Supreme Court's *Anderson-Burdick* framework. This test requires reviewing courts to "weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments ... against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden [] rights." *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1187 (9th Cir. 2021) (citation omitted). Under *Anderson/Burdick*, "[a] law that imposes a 'severe' burden on voting

rights must meet strict scrutiny," whereas "[l]esser burdens ... trigger less exacting review." *Id.* If the burden on voting rights is sufficiently severe, then "the regulation [must] be narrowly tailored to advance a compelling state interest." *Burdick*, 504 U.S. at 433.

It is difficult to imagine state action that would impose a more "severe" burden on the right to vote than abruptly informing an individual who has lived and voted in Arizona for decades—and previously voted in *all* elections, state and federal—that they must suddenly prove that they are a U.S. citizen in the handful of days remaining before Arizona's October 7 voter registration deadline if they want to vote in state elections this year. And that assumes that the notice provided is effective and actually reaches the affected voters. For many, given the short amount of time available to provide notice before the election, the Recorder's proposed notice of the "glitch" may never reach the voter, and they may only discover it when they go to vote in-person or receive a federal-only mail-in ballot—when it would be too late to cure the deficiency belated identified by the State's glitch. Hence, strict scrutiny would apply here.

The government's compelling interest in this case is presumably the need to verify the citizenship status of all registered Arizona voters before

permitting them to vote in state elections. But Petitioner's admission that the administrative error that prompted this situation has apparently existed since 2005—*i.e.*, through nine election cycles—demonstrates that the State's interest is insufficiently compelling to justify *sudden disenfranchisement* based on the State's own error. Emer. Pet. for Special Action at 1.

Nor does it "make it necessary to burden [voting] rights" now. *Ariz. Democratic Party*, 18 F.4th at 1187. If requiring DPOC from people who have held valid Arizona driver's licenses since before 1996 was not deemed necessary for the affected voters to cast ballots in 2006, 2008, 2010, 2012, 2014, 2016, 2018, 2020, or 2022, then it is likewise an insufficiently compelling interest to abruptly require it on the eve of the deadline for registering to vote for the 2024 election.

Finally, it is not "narrowly tailored" to demand that voters take immediate action in the final weeks before voting begins to rectify a clerical error for which fault lies solely with the government. If this Court grants the requested declaratory judgment, almost 100,000 Arizonans would be prevented from voting a full ballot; it is difficult to imagine a remedy that would sweep more broadly than that.

5

## III.  The Requested Relief Would Violate The Due Process Clause

If nearly 100,000 longtime Arizonans are prevented from voting this year due solely to a state agency administrative error that has gone unnoticed for almost twenty years, then the federal due process rights of everyone affected would be violated. The Fourteenth Amendment provides that States may not "deprive any person of ... liberty ... without due process of law." "Because voting is a fundamental right, the right to vote is a 'liberty' interest which may not be confiscated without due process." *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1357 (D. Ariz. 1990).

Due process does not entail any particular set of procedures, only "such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The Supreme Court has traditionally required courts to weigh three factors to assess the precise combo of protections required: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used...; and finally, the Government's interest, including ... the fiscal and administrative burdens

that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

First, the private interest affected is the right to vote, a right that the Supreme Court has deemed "fundamental" because it "is preservative of other basic civil and political rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). "[A]ny alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Id.*

Second, the "risk of an erroneous deprivation of such interest" is extremely and unforgivably high when Petitioner seeks a court order preventing nearly 100,000 Arizonans from voting in state elections a mere three days before UOCAVA ballots are set to be mailed to voters. *Mathews*, 424 U.S. at 335. Although the current situation was instigated by the discovery of a lawful permanent resident with an Arizona driver's license, Petitioner concedes that "most of these voters are likely United States citizens," meaning that there are likely more "false negatives" (U.S. citizens) than true positives (noncitizens) in this universe of voters. Decl. of Stephen Richer, ¶17. That admission is crucial here as "'procedural due process rules are shaped by the *risk of error* inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions.'" *Walters v. National Ass'n of Radiation Survivors*, 473

U.S. 305, 321 (1985) (emphasis added). Here, Petitioner *admits* that the "generality of cases" that the remedy sought will *erroneously* diminish the voting rights of voters who are, in fact, citizens.

Finally, "at minimum" the Due Process Clause requires that deprivation of a liberty interest "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). It is not clear what kind of notice or hearing Petitioner intends to provide to the affected voters, but the Secretary has properly expressed concern that whatever notice is provided will be insufficient given the limited time remaining before the election. Emer. Pet. at 7. Hence, the Secretary has appropriately issued guidance to the County Recorders ordering that they permit the affected voters to participate in all elections this year and verify eligibility later. *Id.*

Unlike in most due process cases, the government here would not be forced to shoulder any additional administrative burden if it adopted the course urged by Respondent and by *amicus*. Ironically, it is *Petitioner* who seeks to impose additional costs upon his own office during the busiest part of the election cycle by recklessly invalidating tens of thousands of valid voter registrations in the weeks leading up to a

presidential election. The Due Process Clause does not require—or permit—such a result.

## IV.  Petitioner's Requested Relief Would Violate Arizona's Free and Equal Elections Clause

The requested declaratory judgment also violates the Arizona Constitution Article II, Section 21 requires that "[a]ll elections shall be free and equal, and no power ... shall at any time interfere to prevent the free exercise of the right of suffrage." This provision "must be read to apply [] to those citizens who have the right of suffrage." *Coronado v. Napolitano*, 2008 U.S. Dist. LEXIS 4909, at *16-17 (D. Ariz. Jan. 22, 2008).

Each of the affected voters currently have the right of suffrage and have regularly exercised that right in state elections, many multiple times *for decades*. Yet Petitioner seeks to interfere with the free exercise of that right by an eleventh-hour demand for proof of citizenship when the government—if it had acted competently—would have identified the issue back in 2005. That relief violates the Arizona Constitution for the same essential reasons as it does the U.S. Constitution under the *Anderson-Burdick* framework. *See supra* at 3-5.

9

## V. The Relief Would Violate the *Purcell* Doctrine

Finally, if for no other reason, the requested relief should be denied because of the predictable consequences of granting it. "Court orders affecting elections ... can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006).

Here, given the proximity to the election, it is less likely that voters will stay home than they will show up to vote without knowing that there is any problem with their registration. In other words, U.S. citizen voters who have lived in Arizona for decades and consistently participated in state elections without issue are likely to show up at their polling place on November 5 only to learn that they have been disenfranchised by a state government clerical error of which they had no prior knowledge. "Confidence in the integrity of our election processes is essential to the functioning of our participatory democracy." *Id.* But the relief Petitioner seeks here would gravely and wantonly undermine that confidence.

## CONCLUSION

For the foregoing reasons, the Court should decline to grant the declaratory judgment sought by Petitioner. This error can be promptly corrected after the election.

Respectfully submitted this 18th day of September, 2024.

HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC

/s/ Andrew Gould
Andrew Gould
Drew C. Ensign
2555 E. Camelback Road, Suite 700
Phoenix, Arizona 85016

*Attorneys for Arizona Republican Party*