IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:24-CV-00547-M

REPUBLICAN NATIONAL COMMITTEE
and NORTH CAROLINA REPUBLICAN
PARTY,

        Plaintiffs,

        v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS, et al.,

        Defendants,

        and

DEMOCRATIC NATIONAL
COMMITTEE,

        Intervenor Defendant.

ORDER

This matter comes before the court on Defendants' motion to dismiss [DE 30] and Plaintiffs' emergency motion to remand [DE 37]. The court ordered an expedited briefing schedule on each motion. DE 36; DE 39. Plaintiffs responded to Defendants' motion and Defendants responded to Plaintiffs' motion. DE 50; DE 51. Intervenor Defendant Democratic National Committee (the "DNC") filed a response in support of Defendants' motion and a response in opposition to Plaintiffs' motion. DE 48; DE 49. Plaintiffs and Defendants also filed reply briefs. DE 52; DE 53. The court then held a hearing on both motions on October 17, 2024.

The court appreciates the parties' compliance with the expedited briefing order and commends them for the comprehensive arguments they presented on a compressed timeline. In

1

considering all the written submissions and the oral arguments made, the court does find that Count One of the Complaint raises a disputed and substantial issue of federal law. The court may therefore exercise subject matter jurisdiction over that claim (and supplemental jurisdiction over Count Two), and further finds that Count One fails on the merits because it provides no private right of action. Accordingly, the court dismisses Count One with prejudice, declines to exercise supplemental jurisdiction over Count Two, and remands that claim to state court.

## I.    CASE HISTORY

Plaintiffs initiated this action in North Carolina state court on August 23, 2024. *See* DE 1-3 at 23. The Complaint contends that Defendants violated state law that requires the North Carolina State Board of Elections ("NCSBE") to comply with Section 303(a) of the Help America Vote Act ("HAVA"). *Id.* at 3, 10-11, 18-19; N.C.G.S. § 163-82.11(c). One relevant provision of HAVA obligates states to collect, in connection with a voter's registration, either the applicant's driver's license number or the last 4 digits of the applicant's social security number (or an affirmation that the applicant has neither). 52 U.S.C. § 21083(a)(5)(A).

Notwithstanding HAVA's dictates, the Complaint alleges that Defendants' voter registration form made optional the fields on the form where applicants would provide either their driver's license number or the last 4 digits of their social security number. DE 1-3 at 12. The Complaint further alleges that, as a result, applicants would "ha[ve] no way to know from the form that the driver's license number or the social security number were required for their form to be accepted and processed by [Defendants]." *Id.* A concerned citizen realized this flaw on the form and filed an administrative complaint with Defendants. *Id.* According to the Complaint, Defendants acknowledged that the voter registration form created the risk of HAVA violations, modified the form prospectively so that it would fully comply with federal law, but declined the

2

citizen's request that they "identify and contact voters whose registrations were improperly accepted." *Id.* at 13-14.

Defendant's alleged noncompliance with HAVA has resulted in "NCSBE accept[ing] hundreds of thousands of voter registration applications without applying the HAVA identifying information requirement." *Id.* at 11. Citing concerns about the potential for voter fraud and vote dilution, Plaintiffs brought this action, raising two claims for relief. *Id.* at 18-20. First, Plaintiffs bring a state law claim under N.C.G.S. § 163-82.11(c), which requires the state to maintain its voter registration list in compliance with Section 303(a) of HAVA. *Id.* at 18-19. Second, Plaintiffs raise a direct claim under the North Carolina Constitution, alleging that "Defendants' actions directly interfere with North Carolinian's fundamental right to vote." *Id.* at 19-20. Plaintiffs seek a court order that Defendants remedy their prior noncompliance with HAVA, including by either removing any ineligible voters from voter registration lists or by requiring registered voters who did not provide HAVA identification information at the time of their application to cast a provisional ballot. *Id.* at 20-21.

While this action was pending in state court, the DNC moved to intervene. DE 1-16 at 2. That motion was granted on September 10. DE 1-18 at 3. Approximately two weeks later, Defendants removed the action to this court. DE 1 at 1-3. Once in federal court, the North Carolina State Conference of the NAACP and two individual voters also sought to intervene. DE 19. The court denied that motion. DE 29.

Plaintiffs now seek remand to state court. DE 37. They argue that remand is warranted because their "complaint raises no federal question." DE 38 at 4. They further assert that removal under 28 U.S.C. § 1443(2) was improper because Defendants have not refused to enforce any discriminatory state law. *Id.* at 9-10.

3

Defendants oppose remand and argue for dismissal of Plaintiffs' complaint. DE 30; DE 51. In support of dismissal, Defendants contend that the doctrine of laches bars Plaintiffs' claims. DE 31 at 12. They also assert that the Complaint fails to state a claim upon which relief may be granted. *Id.* at 16-25. The DNC raised several arguments in support of dismissal and in opposition to remand. DE 48; DE 49. These matters are ripe and ready for decision.

## II.  LEGAL PRINCIPLES

There exist two possible paths to establishing subject matter jurisdiction in this action. First, the claims could raise a federal question under 28 U.S.C. § 1331, which would permit removal under 28 U.S.C. § 1441(a). Second, the action could implicate a federal law providing for equal rights in terms of racial equality, which would authorize removal under 28 U.S.C. § 1443(2). The court discusses each in turn.

### a.  Federal Question Jurisdiction: 28 U.S.C. §§ 1331, 1441(a)

"Federal courts are courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal district court is authorized to exercise subject matter jurisdiction over a "civil action brought in a State court" and removed to federal court, but only if the court would have had "original jurisdiction" if the action were brought in federal court in the first instance. 28 U.S.C. § 1441(a); *Sonoco Prod. Co. v. Physicians Health Plan, Inc.*, 338 F.3d 366, 370 (4th Cir. 2003) ("Typically, an action initiated in a state court can be removed to federal court only if it might have been brought in federal court originally.") (internal brackets and quotation mark omitted). "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c).

4

Subject matter jurisdiction "involves a court's power to hear a case" and "can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002). Consequently, this court "ha[s] an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). This obligation "must be policed" because it keeps the court "within the bounds the Constitution and Congress have prescribed." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

This court's subject matter jurisdiction extends "to all Cases, in Law and Equity, arising under th[e United States] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." U.S. CONST. art. III, § 2. "That grant of power, however, is not self-executing, and it was not until the Judiciary Act of 1875 that Congress gave the federal courts general federal-question jurisdiction." *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 807 (1986). As currently codified, the federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. That statute, like any that confers jurisdiction on an Article III court, is to be strictly construed, *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 109 (1941), and "[i]t is to be presumed that a cause lies outside this limited jurisdiction," *Kokkonen*, 511 U.S. at 377. The burden of overcoming that presumption rests with the party invoking the court's subject matter jurisdiction. *Mulcahey v. Columbia Organic Chemicals Co.*, 29 F.3d 148, 151 (4th Cir. 1994); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

"[T]he vast majority of cases brought under the general federal-question jurisdiction of the federal courts are those in which federal law creates the cause of action." *Merrell Dow*, 478 U.S.

Case 5:24-cv-00547-M-RJ   Document 58   Filed 10/17/24   Page 5 of 44

at 808. "There is, however, another longstanding, if less frequently encountered, variety of federal 'arising under' jurisdiction[;] in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). Phrased another way, a state law cause of action may present a federal question "where the vindication of a right under state law necessarily turned on some construction of federal law." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 9 (1983).[1]

But the full scope of federal question jurisdiction over state law claims that present a federal issue has not always been a model of clarity. *See Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 470 (1957) (Frankfurter, J., dissenting) (characterizing this "litigation-provoking problem" as "the degree to which federal law must be in the forefront of the case and not collateral, peripheral or remote"); *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (describing this area of jurisprudence as "[u]nfortunately" not "a blank canvas" but rather one "that Jackson Pollock got to first"). Over a century ago, in *American Well Works*, Justice Holmes straightforwardly declared that state law claims that raise a federal issue were beyond the reach of federal courts, because "[a] suit arises under the law that creates the cause of action." *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916). Thus, a state law defamation claim predicated on a defendant's statement that the plaintiff's product infringed the defendant's patent did not confer federal question jurisdiction, and any inquiry into the patent was "merely a piece of evidence." *Id.* at 259-260.

---

[1] In an attempt to distinguish between phrases that sound practically identical, the court will refer to a federal "question" to connote the existence of federal subject matter jurisdiction, and otherwise refer to federal "law" or a federal "issue" to connote the presence of a dispute that requires consideration of federal law but that may not necessarily raise a federal "question," that is, a federal court's subject matter jurisdiction.

Case 5:24-cv-00547-M-RJ    Document 58    Filed 10/17/24    Page 6 of 44

The Supreme Court almost immediately retreated from that position, clarifying that federal question jurisdiction exists "where an appropriate statement of the plaintiff's cause of action . . . discloses that it really and substantially involves a dispute or controversy respecting the validity, construction, or effect of a law of Congress." *Hopkins v. Walker*, 244 U.S. 486, 489 (1917). Several years later, in the seminal *Smith* case, the Court acknowledged federal question jurisdiction where a plaintiff shareholder sued a defendant corporation under Missouri law to enjoin the corporation from purchasing United States Government bonds on the basis that the issuance of those bonds was unconstitutional. *Smith v. Kansas City Title & Tr. Co.*, 255 U.S. 180, 195 (1921). Even though state law supplied the cause of action, because it was "apparent that the controversy concern[ed] the constitutional validity of an act of Congress," *id.* at 245-46, the *Smith* Court found that the action raised a federal question. More recently, it has been "settled that Justice Holmes' test [in *American Well Works*] is more useful for describing the vast majority of cases that come within the district courts' original jurisdiction than it is for describing which cases are beyond district court jurisdiction." *Franchise Tax Bd.*, 463 U.S. at 9; *see also T. B. Harms Co. v. Eliscu*, 339 F.2d 823, 827 (2d Cir. 1964) ("Mr. Justice Holmes' formula is more useful for inclusion than for the exclusion for which it was intended.").

In the years that followed, however, "[t]he *Smith* statement [was] subject to some trimming." *Grable*, 545 U.S. at 313. In *Gully*, the Court explained that "[n]ot every question of federal law emerging in a suit is proof that a federal law is the basis of the suit." *Gully v. First Nat. Bank*, 299 U.S. 109, 115 (1936). Rather, in departing significantly from Justice Holmes' test but stressing a degree of nuance absent from *Smith*, Justice Cardozo emphasized that "[w]hat is needed" to determine whether an action presents a federal question "is something of that common-sense accommodation of judgment to kaleidoscopic situations which" involve a federal issue. *Id.*

at 117. This involves "a selective process which picks the substantial causes out of the web and lays [aside] the other ones." *Id.* at 118. Decades later, the Court made the understated concession that the phrase "arising under" in Section 1331 "has resisted all attempts to frame a single, precise definition" and "masks a welter of issues regarding the interrelation of federal and state authority and the proper management of the federal judicial system." *Franchise Tax Bd.*, 463 U.S. at 8; *see also Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 379 (1959) (acknowledging that Section 1331 must be "continuously construed and limited in the light of the history that produced it, the demands of reason and coherence, and the dictates of sound judicial policy which have emerged from [that statute's] function as a provision in the mosaic of federal judiciary legislation").

The current boundaries of Section 1331, as applied to state law claims that present an issue of federal law, have been outlined by a (somewhat recent) quartet of Supreme Court cases. First, in *Franchise Tax Board*, the Court articulated that a state cause of action confers federal question jurisdiction only if the "right to relief . . . requires resolution of a substantial question of federal law in dispute between the parties." *Franchise Tax Bd.*, 463 U.S. at 13. If "federal law becomes relevant only by way of a defense," then federal question jurisdiction is lacking. *Id.* Likewise, even a "state declaratory judgment claim[]" that "rais[es] questions of federal law" does not provide a federal court with "original jurisdiction." *Id.* at 18-19.

Then, in *Merrell Dow*, the Court held that a state law products liability claim did not present a federal question, even though the plaintiffs were entitled to a rebuttable presumption of negligence if they could establish that the defendant misbranded the product in violation of the Federal Food, Drug, and Cosmetic Act ("FDCA"). *Merrell Dow*, 478 U.S. at 805. Critical to the Court's analysis there was its assumption that "that there is no federal cause of action for FDCA

8

violations." *Id.* at 811. The "significance" of that "assumption" could not "be overstated," because it would "flout, or at least undermine, congressional intent to conclude that the federal courts might [] exercise federal-question jurisdiction and provide remedies for violations of that federal statute solely because the violation of the federal statute is" an element of a state law cause of action. *Id.* at 812. In other words, "the congressional determination that there should be no federal remedy for the violation of [the FDCA] is tantamount to a congressional conclusion that the presence of a claimed violation of the statute as an element of a state cause of action is insufficiently substantial to confer federal-question jurisdiction." *Id.* at 814. *Merrell Dow* thus underscores that judicial determinations about the substantiality of a federal issue take place in context, and require "sensitive judgments about congressional intent, judicial power, and the federal system." *Id.* at 810.

By implication, *Merrell Dow* left open the question of whether a state law claim that presents a federal issue only confers federal question jurisdiction if federal law independently supplies a cause of action, and a circuit split emerged. *Compare Utley v. Varian Assocs., Inc.*, 811 F.2d 1279, 1283 (9th Cir. 1987) ("Under *Merrell Dow*, if a federal law does not provide a private right of action, then a state law action based on its violation perforce does not raise a 'substantial' federal question."), *with Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799, 807 (4th Cir. 1996) (concluding that state law claim "arises under federal law within the meaning of 28 U.S.C. § 1331" where it "implicates a substantial federal interest," notwithstanding that "the cause of action is not federally created to arise under federal law"). The Supreme Court sought to answer that question in *Grable*.

*Grable* involved a state law quiet title action. *Grable*, 545 U.S. at 310. The Internal Revenue Service ("IRS") seized the petitioner's property to satisfy a tax delinquency, and prior to

9

the seizure provided the petitioner with notice by certified mail. *Id.* The IRS then sold the property to the respondent. *Id.* The petitioner later brought an action to quiet title to the property, in which he alleged that the respondent's title was invalid because the IRS failed to personally serve him with notice of the seizure in violation of federal law. *Id.* at 310–11.

In considering whether the petitioner's state law claim presented a federal question, the Court noted that there was no "federal cause of action to try claims of title to land obtained at a federal tax sale." *Id.* at 310. Even so, the Court concluded that the "case warrants federal jurisdiction" because an "essential element" of the state law claim, perhaps "the only legal or factual issue contested in the case," involved "an important issue of federal law that sensibly belongs in a federal court." *Id.* at 314-15.

The *Grable* Court stressed further that *Merrell Dow* should not be read as adopting any "bright-line rule" that "make[s] a federal right of action mandatory." *Id.* at 317. Instead, that case "specifically retained" the "contextual enquiry" a court must make into "congressional intent." *Id.* *Grable* and *Merrell Dow* can therefore be interpreted as reaching different conclusions due to case-specific concerns regarding federalism. On the one hand, "because it will be the rare state title case that raises a contested matter of federal law [such as in *Grable*], federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor." *Id.* at 315. On the other, "exercising federal jurisdiction over a state misbranding action [such as in *Merrell Dow*] would have attracted a horde of original filings and removal cases raising other state claims with embedded federal issues." *Id.* at 318. Accordingly, those cases instruct that, when making a "sensitive judgment[] about congressional intent, judicial power, and the federal system," *Merrell Dow*, 478 U.S. at 810, a federal court must

10

consider the impact of its judgment on "the normal currents of litigation." *Grable*, 545 U.S. at 319.

Since *Grable*, the Court has indicated that state law causes of action that raise a sufficiently substantial federal issue so as to confer federal question jurisdiction represent a "special and small category." *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 699 (2006). Several years later, the Court in *Gunn* ultimately "outlin[ed] the contours of this slim category," and in so doing "condensed [its] prior cases into a [four-element] inquiry," where "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. *Gunn's* four-factor test remains the yardstick against which the propriety of extending federal question jurisdiction to state law causes of action is measured. *E.g.*, *Burrell v. Bayer Corp.*, 918 F.3d 372, 379 (4th Cir. 2019) (finding that North Carolina tort claims did not necessarily raise question of federal law).

### b. Private Rights of Action

The presence or absence of a private right of action is, at a minimum, "relevant to" the substantiality inquiry, *Grable*, 545 U.S. at 318, and at times its absence may be "tantamount to a congressional conclusion that the presence of a claimed violation of the statute as an element of a state cause of action is insufficiently 'substantial' to confer federal-question jurisdiction," *Merrell Dow*, 478 U.S. at 814. Although typically, "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998), here it does because of its bearing on the court's substantiality analysis under *Merrell Dow*, *Grable*, and *Gunn*.

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Sometimes, Congress does so expressly. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 166 (2008). Other times, a right of action may be "implicit in a statute." *Cort v. Ash*, 422 U.S. 66, 78 (1975). The ultimate "judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander*, 532 U.S. at 286. The absence of that dual intent is dispositive because "[r]aising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 365 (1991) (Scalia, J., concurring).

"[S]everal factors are relevant" in this inquiry, including (1) whether the plaintiff is "one of the class for whose especial benefit the statute was enacted," (2) whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one," (3) whether an implied right of action would be "consistent with the underlying purposes of the legislative scheme," and (4) whether "the cause of action [is] one traditionally relegated to state law." *Cort*, 422 U.S. at 78. Although these several factors are all relevant, the determination "must ultimately rest on congressional intent to provide a private remedy." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1102 (1991); *see also Alexander*, 532 U.S. at 286 ("Statutory intent . . . is determinative."); *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) (emphasizing that the focus "in any case involving the implication of a right of action[] is on the intent of Congress"). After all, "the Legislature is in the better position" than the judicial branch "to consider if the public interest would be served by imposing a new substantive legal liability." *Ziglar v. Abbasi*, 582 U.S. 120, 136 (2017) (internal quotation marks omitted).

12

As it relates to private causes of action, North Carolina law is at least as restrictive as federal law. Although in theory a state "statute may authorize a private right of action either explicitly or implicitly," *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 338, 828 S.E.2d 467, 474 (2019), typically "a statute allows for a private cause of action *only* where the legislature has expressly provided a private cause of action within the statute," *Time Warner Ent. Advance/Newhouse P'ship v. Town of Landis*, 228 N.C. App. 510, 516, 747 S.E.2d 610, 615 (2013) (emphasis added); *see also United Daughters of the Confederacy v. City of Winston-Salem by & through Joines*, 383 N.C. 612, 637, 881 S.E.2d 32, 52 (2022) (observing that state Supreme Court "has not addressed the circumstances in which a statute *implicitly* authorizes a private cause of action") (emphasis in original).

Notwithstanding the lack of guidance from the North Carolina Supreme Court, several state Court of Appeals decisions have recognized an implicit right of action in a statute where the statute directs one party to take some discrete action for the benefit of an identified group, and the party directed to act "has failed to comply with the statutory mandate." *Sugar Creek Charter Sch., Inc. v. Charlotte-Mecklenburg Bd. of Educ.*, 195 N.C. App. 348, 356, 673 S.E.2d 667, 673 (2009). For example, in *Williams v. Alexander County*, the Court of Appeals concluded that a statute requiring school boards to pay specific sums to teachers participating in a particular training program created an implied right of action for those teachers to recover for nonpayment in violation of the statute. *Williams v. Alexander Cnty. Bd. of Educ.*, 128 N.C. App. 599, 604, 495 S.E.2d 406, 409 (1998). And in *Sugar Creek*, the Court of Appeals held that a statute directing county school boards to pay fixed amounts to local charter schools based on their enrollment impliedly created a right of action for charter schools "when they allege [a] violation of the mandatory provisions of this statute." *Sugar Creek*, 195 N.C. App. at 357, 673 S.E.2d at 674.

13

But where a state statute "do[es] not enunciate an explicit or implicit intent on the part of the General Assembly to create a statutory protection for" a particular group, a court is not free to fashion an implied right of action. *Lea v. Grier*, 156 N.C. App. 503, 509, 577 S.E.2d 411, 416 (2003). And where a statute provides for an administrative enforcement regime, there is "no legislative implication" that the statute "allow[s] for enforcement by a private party." *Sykes*, 372 N.C. at 338, 828 S.E.2d at 474–75; *see also Cobb v. Pennsylvania Life Ins. Co.*, 215 N.C. App. 268, 281, 715 S.E.2d 541, 552 (2011). Like federal jurisprudence on implied rights of action, North Carolina law recognizes that "[t]he regulation of access to the courts is largely a legislative task and one that courts should hesitate to undertake. For this reason, implied rights of action are disfavored and will not be found in the absence of clear legislative intent." *Long v. State Dep't of Hum. Res.*, 145 N.C. App. 186, 188, 548 S.E.2d 832, 834 (2001).

### c. Removal Jurisdiction Under 28 U.S.C. § 1443(2)

Removal is independently authorized for any civil action that involves an "act under color of authority derived from any law providing for equal rights," or the refusal "to do any act on the ground that it would be inconsistent with such law." 28 U.S.C. § 1443(2). The second portion of that provision is relevant here, known as the refusal clause. *Stephenson v. Bartlett*, 180 F. Supp. 2d 779, 785 (E.D.N.C. 2001) (explaining that refusal clause "provides that state officers can remove to federal court if sued for refusing to do any act on the ground that it would be inconsistent with any law providing for civil rights") (internal brackets and quotation marks omitted).

Although the plain terms of Section 1443(2) appear to capture any number of recognized civil rights, "[t]he Supreme Court has limited the meaning of a 'law providing for equal rights' in § 1443 to only those concerning racial equality." *Vlaming v. W. Point Sch. Bd.*, 10 F.4th 300, 309 (4th Cir. 2021). In *Rachel*, the Supreme Court concluded that the statutory language "must be

14

construed to mean any law providing for specific civil rights *stated in terms of racial equality*."

*State of Ga. v. Rachel*, 384 U.S. 780, 792 (1966) (emphasis added). On the other hand, laws that "are phrased in terms of general application available to all persons or citizens," and not in "specific language of racial equality," do not grant removal jurisdiction under Section 1443. *Id.* Although "the plain text of the statute suggests a broader interpretation," this court "must take the Supreme Court at its word and faithfully apply its precedent." *Vlaming*, 10 F.4th at 310.

### d. Motions to Dismiss

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). As a result, the court accepts the complaint's factual allegations as true, and construes them in the light most favorable to the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009).

Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," the "allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And importantly, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Likewise, "[l]abels, conclusions, recitation of a claim's elements, and naked assertions devoid of further factual enhancement will not suffice." *ACA Fin. Guar. Corp. v. City of Buena Vista*, Virginia, 917 F.3d 206, 211 (4th Cir. 2019). Ultimately, when considering a motion to dismiss, the court must "draw

15

on its judicial experience and common sense" to determine whether the complaint "states a plausible claim for relief." *Iqbal*, 556 U.S. at 679.

## III. ANALYSIS

### a. Motion to Remand

The court's analysis must begin with Plaintiffs motion to remand because that motion challenges the court's subject matter jurisdiction. DE 37. Without subject matter jurisdiction, the court has no power to hear the case and cannot reach the merits of Defendants' motion. *Cotton*, 535 U.S. at 630.

As previously detailed, this court's subject matter jurisdiction extends to any civil action "arising under" the laws of the United States. 28 U.S.C. § 1331. For federal jurisdiction to lie over the state law claims presented here, those claims must "(1) necessarily raise[]" an issue of federal law, and that issue of federal law must be "(2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. Defendants, the parties invoking the court's subject matter jurisdiction, bear the burden of establishing that these four factors are met. *Mulcahey*, 29 F.3d at 151. If any factor is not met, "the case shall be remanded." 28 U.S.C. § 1447(c).

First, the court will consider whether Count Two raises a federal question, because the analysis of that claim is more straightforward and Defendants have not convincingly argued that it does. *See* DE 51 at 12 (suggesting that "Plaintiffs' ill-defined state-constitutional claim would also seem to depend on a construction of HAVA"), 16-17 (discussing fourth prong of *Grable-Gunn* test as applied to Count One, but not Count Two); DE 49 at 8 (DNC brief discussing federal-state balance without mention of state interest in adjudication of state constitutional claim). After concluding that original jurisdiction is lacking as to Count Two, the court will then evaluate

Case 5:24-cv-00547-M-RJ   Document 58   Filed 10/17/24   Page 16 of 44

whether Count One raises a federal question. That claim does, so the court may exercise original jurisdiction over it, as well as supplemental jurisdiction over Count Two. 28 U.S.C. §1367(a).

After completing its federal question analysis, the court will next consider whether Section 1443(2) independently supplies removal jurisdiction. The court concludes it does not. That jurisdictional posture partially informs resolution of Defendants' motion to dismiss, which the court considers last.

### i. Count Two – State Constitutional Claim

Plaintiffs allege that Defendants denied North Carolinians equal protection of the laws in violation of the North Carolina Constitution, in that Defendants' failure to comply with state law and HAVA has interfered with citizens' "fundamental right to vote." DE 1-3 at 20. The court will assume without deciding that this claim necessarily raises a disputed and substantial issue of federal law.[2] Nonetheless, finding federal question jurisdiction over this claim would fundamentally disrupt "the federal-state balance," *Gunn*, 568 U.S. at 258, precluding the exercise of original jurisdiction.

"It is fundamental that state courts be left free and unfettered by [federal courts] in interpreting their state constitutions." *Minnesota v. Nat'l Tea Co.*, 309 U.S. 551, 557 (1940). Since the founding of our constitutional republic, it has been settled that "the powers of the states depend upon their own constitutions," and that "the people of every state ha[ve] the right to modify and restrain them, according to their own views of the policy or principle." *Martin v. Hunter's Lessee*, 14 U.S. 304, 325 (1816). Usurping that role from the state would "disregard[] principles of federalism" and "denigrate[] the state's authority to fashion independent constitutional law." *Carpenter v. Wichita Falls Indep. Sch. Dist.*, 44 F.3d 362, 367 (5th Cir. 1995) (finding that state

---

[2] At the October 17 hearing, Defendants and the DNC persuasively argued that Count 2 involves the same disputed issues pertaining to HAVA as Count One.

constitutional claim did not present federal question and reversing denial of motion to remand); *accord Lynchburg Range & Training v. Northam*, 455 F. Supp. 3d 238, 246 (W.D. Va. 2020) ("recogniz[ing] the paramount importance of state judiciaries in interpreting their respective constitutions" and remanding state constitutional claim to state court).

For that matter, it is of no moment that the North Carolina Supreme Court's "analysis of the State Constitution's Equal Protection Clause generally follows the analysis of the Supreme Court of the United States." *Blankenship v. Bartlett*, 363 N.C. 518, 522, 681 S.E.2d 759, 762 (2009). Regardless of that general practice, the North Carolina Supreme Court "is not bound by opinions of the Supreme Court of the United States construing even identical provisions in the Constitution of the United States." *State v. Arrington*, 311 N.C. 633, 642, 319 S.E.2d 254, 260 (1984); *see also Cooper v. State of Cal.*, 386 U.S. 58, 62 (1967) (acknowledging "State's power to impose higher standards [for analogous state constitutional provisions] than [those] required by the Federal Constitution if it chooses to do so"). And the North Carolina Supreme Court's "independent authority to interpret state constitutional provisions reflects the unique role of state constitutions and state courts within our system of federalism." *State v. Kelliher*, 381 N.C. 558, 580, 873 S.E.2d 366, 383 (2022).

Declaring the existence of federal question jurisdiction over a state constitutional claim, even where that claim raises an issue of federal law, would contort "the interrelation of federal and state authority," and upend "the proper management of the federal judicial system." *Franchise Tax Bd.*, 463 U.S. at 8. The "disruptive portent in exercising federal jurisdiction" would create the risk of "a horde of original filings and removal cases" involving state constitutional claims. *Grable*, 545 U.S. at 314, 318. That would leave federal judges as the arbiters of state constitutional rights and turn our system of federalism on its head. That is not what Congress could have intended

18

when it granted federal courts subject matter jurisdiction over "civil actions arising under" the "laws . . . of the United States." 28 U.S.C. § 1331. The court finds it has no original jurisdiction over Count Two in the Complaint.

### ii. Count One - N.C.G.S. 163-82.11(c)

Count One raises a violation of state law that requires the NCSBE to "update the statewide computerized voter registration list and database to meet the requirements of section 303(a) of the Help America Vote Act of 2002." N.C.G.S. § 163-82.11(c). Per the Complaint, Defendants violated HAVA, and therefore this statute, by failing to collect either a driver's license number or the last 4 digits of a social security number in connection with hundreds of thousands of voter registrations, and by refusing to "to maintain accurate voter rolls." DE 1-3 at 18-19.

#### 1. *Necessarily Raised*

This claim necessarily raises an issue of federal law. "To prevail on [the] claim," Plaintiffs "must show that" Defendants failed to comply with Section 303(a) of HAVA. *Gunn*, 568 U.S. at 259. "That will necessarily require application of [HAVA] to the facts of [Plaintiffs'] case." *Id.* In other words, whether Defendants violated HAVA is "an essential element" of Plaintiffs' state law claim. *Grable*, 545 U.S. at 315; *see also* N.C.G.S. § 163-82.11(c). And "the claim's very success depends on giving effect to a federal requirement." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 384 (2016). The court finds the first factor is met.

#### 2. *Disputed*

Plaintiffs argue that any issue of federal law necessarily raised by Count One is not disputed, because Defendants admitted in a meeting and through a written order that they formerly did not use a voter registration form that complied with Section 303(a) of HAVA. DE 38 at 5-6. The court has independently considered that evidence, as it is permitted to do when its subject

19

matter jurisdiction is in question. *Arbaugh*, 546 U.S. at 514; *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991); *Wild v. Gaskins*, 30 F. Supp. 3d 458, 461 (E.D. Va. 2014).[3] After review of the recording of the NCSBE meeting,[4] as well as the order issued, the court finds that Defendants effectively conceded a violation of 52 U.S.C. § 21083(a)(5)(a), so any issue involving that specific provision of HAVA is undisputed.

That narrow finding, however, does not resolve whether Count One raises disputed issues of federal law. Section 163-82.11 employs broad language and requires Defendants to "*update* the statewide computerized voter registration *list and database* to meet the requirements of section 303(a) of the Help America Vote Act of 2002." N.C.G.S. § 163-82.11(c) (emphasis added). By its plain terms, Section 163-82.11 does not concern only the initial act of voter registration, the requirements for which are found at 52 U.S.C. § 21083(a)(5)(A). The state statute also governs "update[s]" to the "list and database," N.C.G.S. § 163-82.11(c), which corresponds to 52 U.S.C. § 21083(a)(2)(A), a separate sub-provision that also falls under Section 303(a) of HAVA.

Section 21083(a)(2) obligates state officials to "perform list maintenance with respect to" the state's voter registration list. 52 U.S.C. § 21083(a)(2)(A). In conducting regular list maintenance, a state official may *only* remove a registered voter from a registration list in accordance with certain "provisions of the National Voter Registration Act of 1993." 52 U.S.C. § 21083(a)(2)(A)(i). The National Voter Registration Act ("NVRA"), in turn, circumscribes the

---

[3] These materials were also incorporated into the Complaint by reference, and the court may take judicial notice of them. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Alternatively, to the extent this extrinsic evidence is also partially relevant to the merits of Plaintiffs' claim, implicating the right to trial by jury, *see Arbaugh*, 546 U.S. at 514 (noting that "the jury is the proper trier of contested facts" related to an "essential element of a claim for relief"), the court would still be free to consider it because there would have been no constitutional right to trial by jury for claims addressing North Carolina's compliance with HAVA, a law passed in 2002, "at the time the [State] Constitution of 1868 was adopted." *Kiser v. Kiser*, 325 N.C. 502, 507, 385 S.E.2d 487, 490 (1989).

[4] A recording of the meeting is available at https://dl.ncsbe.gov/State_Board_Meeting_Docs/2023-11-28/Part%201%20-%20State%20Board%20of%20Elections%20Meeting-20231128.mp4. The vote on the concerned citizen's complaint occurs at 1:26:42. The full discussion begins at 1:09:08. A copy of the NSCBE order is available at https://dl.ncsbe.gov/State_Board_Meeting_Docs/Orders/Other/2023%20HAVA%20Complaint%20-%20Snow.pdf.

20

circumstances under which a state official may remove a registered voter from a registration list. 52 U.S.C. § 20507(a). Those circumstances include removal (1) "at the request of the registrant," (2) due to a "criminal conviction or mental incapacity" that mandates removal by operation of state law, (3) by reason of "the death of the registrant," or (4) because of "a change in the residence of the registrant," where the state uses "change-of-address information supplied by the Postal Service," and either confirms the change of address with the registrant, or provides notice to the registrant that the state has received information indicating that the registrant has changed addresses, and the registrant fails to respond and "has not voted or appeared to vote in 2 or more consecutive general elections for Federal office." 52 U.S.C. §§ 20507(a)(3)(A), (a)(3)(B), (a)(4)(A), (a)(4)(B), (b)(2)(A), (b)(2)(B), (c)(1)(A), (c)(1)(B), (d)(1)(A), & (d)(1)(B).

Notably, those defined circumstances do not include a voter's failure to initially register to vote in compliance with Section 21083(a)(5)(A)(i) of HAVA. *See generally* 52 U.S.C. § 20507. Accordingly, the issue of federal law presented by the claim in Count One is whether Defendants failed to "update . . . the voter registration list and database," N.C.G.S. § 163-82.11(c), when they "perform[ed] list maintenance," 52 U.S.C. § 21083(a)(2)(A), and (as Plaintiffs allege) did not "remov[e] ineligible persons from the voter roll," DE 1-3 at 18, when Defendants based their removal decisions on specified "provisions of the National Voter Registration Act of 1993," 52 U.S.C. § 21083(a)(2)(A)(i), and not an initial failure to register in a manner consistent with 52 U.S.C. § 21083(a)(5)(A)(i).[5]

---

[5] The court has also considered whether this disputed issue of federal law is necessarily raised, considering that Defendants effectively conceded the old voter registration form violated Section 21083(a)(5)(A) of HAVA. To be sure, if a plaintiff pleads alternative theories to relief, and only one of those theories necessarily raises a disputed issue of federal law, federal question jurisdiction is lacking. *Burrell*, 918 F.3d at 383. As a result, Plaintiffs in theory could have attempted to articulate a violation of Section 163-82.11(c) that rested *solely* on Defendants' registration of voters in a manner out of compliance with HAVA. But Plaintiffs are the masters of their Complaint and that is not the theory that they alleged. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). Rather, their theory captures a singular course of conduct where Defendants violated state law by registering voters without collecting information required by HAVA and then by refusing to consider removal of those improperly-registered voters; under a fair reading of the

That is the issue of federal law, and it is disputed. Plaintiffs say Defendants are required to remove these voters. *See* DE 1-3 at 18-19. Defendants say they cannot do so. *See* DE 31 at 7-8. The court expresses no view on the strength of either position, but observes that, if Defendants' argument prevails, then they will not have violated their duty to "update the statewide computerized voter registration list and database to meet the requirements of section 303(a) of the Help America Vote Act of 2002," meaning that Count One would likely fail on the merits. N.C.G.S. § 163-82.11(c). On the other hand, if Plaintiffs' position prevails (i.e., that the NVRA's restrictions on removals only applies to valid registrants, and individuals who registered to vote in a manner inconsistent with HAVA are not valid registrants), then they could prevail on their claim that Defendants failed to update the voter registration list to meet the requirements of HAVA.

Like in *Grable*, the meaning of "section 303(a)" of HAVA is "an essential element" of Plaintiffs' claim under Section 163-82.11. *Grable*, 545 U.S. at 315. This question of federal law "requires resolution," *Franchise Tax Bd.*, 463 U.S. at 13, and "is the central point of dispute," *Gunn*, 568 U.S. at 259. Because Plaintiffs' state law claim "really . . . involves a dispute"

---

Complaint, the court cannot dissect and accentuate the allegations related to registration and overlook those related to list maintenance. *See, e.g.*, DE 1-3 at 9 (describing as "[i]mportant[]" HAVA's "processes and procedures for *removing* the names of ineligible voters from the state's voter rolls"), 14 (alleging that Defendants must "identify and contact voters whose registrations were improperly accepted"), 14 (contending that Section 163-82.11(c) mandates that Defendants "take[] immediate action to *correct* the accuracy of the state's voter rolls"), 15 (asserting that "Defendants should have immediately taken action to remedy" situation of improperly-registered voters), 16 ("By allowing ineligible voters to register *and then remain* on the North Carolina voter rolls, Defendants have brought the security and validity of the state's elections into question."), 16 ("If Defendants do not *remove* ineligible voters from the state's voter rolls, then the legitimate votes of qualified voters will be diluted and disenfranchised in upcoming elections."), 17 (contending that Section 163-82.11(c) requires "remov[al of] the names of ineligible voters from voting rolls"), 18 ("HAVA also requires that Defendants . . . remov[e] ineligible persons from the voter roll.") (emphases added). As the foregoing excerpts demonstrate, the theory Plaintiffs articulated in their Complaint necessarily raises the HAVA and NVRA issues related to removal of voters from registration lists that the court has just highlighted. Plaintiffs have attempted to reframe their Section 163-82.11 theory through briefing to avoid disputed issues of federal law, DE 38 at 5-6, particularly their Reply brief in support of remand, DE 52 at 4-6, but "[i]t is well-established that parties cannot amend their complaints through briefing or oral advocacy," *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).

22

concerning the "construction, or effect," of a federal law, *Shulthis v. McDougal*, 225 U.S. 561, 569 (1912), the court finds the second factor met.

### 3. *Substantial*

The court turns next to consideration of whether the HAVA (and, by extension, NVRA) issues presented by Plaintiffs' claim involves a substantial question of federal law. As noted previously, there is a "long-settled understanding that the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Merrell Dow*, 478 U.S. at 813. Rather, the court seeks to adhere to Justice Cardozo's instruction that courts should apply a "common-sense accommodation of judgment" in what is assuredly "a selective process which picks the substantial causes out of the web and lays [aside] the other ones." *Gully*, 299 U.S. at 115.

On balance, the court finds that Count One falls into that "special and small category" of state law claims that present a substantial question of federal law. *Empire Healthchoice*, 547 U.S. at 699. Distilled to its essence, this case concerns whether or not a state may, or in fact must, remove a registered voter from a voting roll shortly before a national election or require that voter to cast a provisional ballot because that voter (through no apparent fault of their own) was initially registered to vote in a manner inconsistent with federal law. From Plaintiffs' perspective, this case is about public confidence in the integrity of an election and the importance of removing improperly-registered voters from voting rolls as a potential means to prevent voting fraud and voter disenfranchisement or dilution. From Defendants' perspective, the act of removing voters who were improperly registered but who are nonetheless eligible to vote would result in another form of the very disenfranchisement that Plaintiffs ostensibly seek to avoid. There is a substantial federal interest in protecting the right to vote *and* in ensuring the integrity of elections. From

23

whichever perspective the court views the question presented, it discerns a substantial question of federal law.

"It is beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (emphasis omitted). "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). This fundamental right is "secured by the Equal Protection Clause of the Fourteenth Amendment," *Schilling v. Washburne*, 592 F. Supp. 3d 492, 497 (W.D. Va. 2022), and the significance of voting to our constitutional structure is reflected in the NVRA. 52 U.S.C. § 20501(a).

At the same time, the court recognizes that each state also has "a compelling interest in preserving the integrity of its election process," and that "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). Weighing the respective federal and state interests in the electoral context represents a delicate endeavor because both sovereigns share constitutional authority over this field. U.S. CONST. Art. I, § 4, cl. 1. HAVA attempts to reflect this balance, by granting the states substantial discretion in implementing their own "methods" for "complying with the requirements" of HAVA. 52 U.S.C. § 21085. North Carolina's General Assembly has exercised that discretion in part by enacting Section 163-82.11.

Ultimately, though, this third factor does not call for a balancing test. Rather, the inquiry turns on whether the federal issue is substantial. A state law claim involves a substantial issue of federal law when it entails "construction of a federal statute" and is important "to the federal system as a whole." *Burrell*, 918 F.3d at 385.

24

With the relevant inquiry so framed, the court concludes that "[t]he meaning of federal [election statutes] is an important issue of federal law that sensibly belongs in a federal court." *Grable*, 545 U.S. 315. This is not a case where "a question of federal law is [merely] lurking in the background." *Gully*, 299 U.S. at 117. Rather, determination of a state's continuing obligations under HAVA and the NVRA for registered voters who were initially registered improperly would have "real-world result[s]" and implications for a forthcoming national election. *Gunn*, 568 U.S. at 261. Where those implications include an individual's capability to cast a vote, a fundamental right secured by the Fourteenth Amendment, the federal interest is near its zenith.

Cases evaluating the extent to which a state law claim presents a substantial question of federal law emphasize that the question must be important to more than just the "particular parties in the immediate suit." *Burrell*, 918 F.3d at 385. The question must be important "to the federal system as a whole." *Gunn*, 568 U.S. at 260. The questions of federal law embedded in Count One meet that standard; the answers to those questions will "affect non-parties to this case," *Burrell*, 918 F.3d at 386, and the federal "Government has a strong interest in" states' compliance with federal election law, *Grable*, 545 U.S. 315. Likewise, "[s]tate by state variations of interpretation about" the scope of a state's obligations under HAVA and the NVRA creates the risk of horizontal disuniformity and would "thereby undermine the very device[s] that Congress created" to ensure a uniform national system of voter registration and election administration. *Ormet Corp.*, 98 F.3d at 807. This case presents a substantial federal question.

Case 5:24-cv-00547-M-RJ   Document 58   Filed 10/17/24   Page 25 of 44

### a. Neither Section 21083(a)(2)(A) nor Section 21083(a)(5)(A)(i) confer a private right of action.

As part of its analysis of this third factor, the court has considered whether the provisions of HAVA relevant here independently supply a private cause of action.[6] The absence of a private right of action under the FDCA was dispositive in *Merrell Dow*, and *Grable* instructs that the presence or absence of a private cause of action is at least relevant to the substantiality inquiry. *Merrell Dow*, 478 U.S. at 814; *Grable*, 545 U.S. at 318.

"HAVA by its terms does not create a private right of action." *Colon-Marrero v. Velez*, 813 F.3d 1, 15 (1st Cir. 2016). In the absence of an express private right of action, the court should presume "one does not exist." *Ormet Corp.*, 98 F.3d at 805. That said, a right of action may still be "implicit in a statute." *Cort*, 422 U.S. at 78. As a result, this court's task is to interpret the relevant provisions of HAVA "to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander*, 532 U.S. at 286.

The court's analysis does not take place on an entirely blank slate. In *Brunner*, a one-paragraph per curiam opinion, the Supreme Court vacated a temporary restraining order issued by a district court and held that the plaintiffs were "not sufficiently likely to prevail on the question whether Congress has authorized the District Court to enforce § 303 [of HAVA] in an action brought by a private litigant to justify the issuance of a TRO." *Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008). That holding is not dispositive in this case, though, for two reasons. First, a finding that the plaintiffs were not "sufficiently likely to prevail" in order "to justify the issuance of a TRO" is not tantamount to a conclusion that a private right of action is entirely foreclosed by the statute. *Id.* And second, although the *Brunner* Court referred broadly to Section 303 of HAVA,

---

[6] At the October 17 hearing, all parties appeared in agreement that HAVA does not provide a private cause of action. But given its bearing on the court's subject matter jurisdiction, the court nevertheless undertakes this inquiry notwithstanding the agreement of the parties.

the specific provision at issue in *Brunner* was Section 21083(a)(5)(B)(i), not Section 21083(a)(5)(A)(i) or Section 21083(a)(2)(A). *See id.* at 6 n.*.

Accordingly, since *Brunner*, two courts of appeals have found an implied private right of action (enforceable through 42 U.S.C. § 1983) under certain provisions of Section 303 of HAVA. *See Colon-Marrero*, 813 F.3d at 17–18 (finding implied private of action under Section 21083(a)(4)(A) for registrants who were improperly removed from voter rolls); *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 573 (6th Cir. 2004) ("Individual enforcement of [HAVA's provision permitting casting of provisional ballot] under § 1983 is not precluded"). Other courts have come to contrary conclusions. *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019) ("HAVA creates no private cause of action."); *American C.R. Union v. Philadelphia City Commissioners*, 872 F.3d 175, 184–85 (3d Cir. 2017) ("HAVA only allows enforcement via attorney general suits or administrative complaint."); *Crowley v. Nevada ex rel. Nevada Sec'y of State*, 678 F.3d 730, 736 n.4 (9th Cir. 2012) (district court's assumption that HAVA creates a private right of action was "doubt[ful]"). In the absence of authoritative guidance from the Fourth Circuit, and in recognition of the fact that "courts have disagreed as to whether HAVA provides a private right of action," *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 662 (M.D.N.C. 2024), this court's analysis remains guided by the *Cort* factors, *Cort*, 422 U.S. at 78, although the determination "must ultimately rest on congressional intent to provide a private remedy," *Virginia Bankshares*, 501 U.S. at 1102.

Section 21083(a)(2)(A) provides that "[t]he appropriate State or local election official shall perform list maintenance with respect to" that state's voter registration list in a manner consistent with the NVRA. 52 U.S.C. § 21083(a)(2)(A). Section 21083(a)(5)(A)(i) mandates that, prior to

processing a voter's registration, "a State" must collect the applicant's "driver's license number" or "the last 4 digits of the applicant's social security number." 52 U.S.C. § 21083(a)(5)(A)(i).

The court finds the first *Cort* factor, whether Plaintiffs are within the class for whose "especial benefit" these provisions were intended, weighs heavily against implying a private right of action. *Cort*, 422 U.S. at 78. These provisions of HAVA "are designed only to guide the State in structuring its systemwide efforts at" voter registration and voter list maintenance. *Blessing v. Freestone*, 520 U.S. 329, 344 (1997). Statutory provisions such as these "that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Alexander*, 532 U.S. at 289 (internal quotation mark omitted).

Although at some level these provisions of HAVA are aimed at ensuring the proper administration and integrity of elections, which in turn benefits all voters, it's not enough that "the plaintiff falls within" some "general zone of interest that the statute is intended to protect." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). "[S]uch a definition of 'especial' beneficiary" would "make[] this factor meaningless." *California v. Sierra Club*, 451 U.S. 287, 294 (1981). Rather, something more "is required for a statute to create rights enforceable directly from the statute itself under an implied private right of action." *Gonzaga*, 536 U.S. at 283. The statute must manifest "an unmistakable focus on the benefited class." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 691 (1979)

Put another way, "[t]he question is not simply who would benefit from" these provisions of HAVA, but rather "whether Congress intended to confer federal rights upon those beneficiaries." *Sierra Club*, 451 U.S. at 294. These provisions of HAVA do not "unmistakabl[y] focus" on Plaintiffs or the voters they represent; the provisions do not mention them at all. *Cannon*, 441 U.S. at 691. The court thus finds that these provisions do not "create[] an individually

enforceable right in the class of beneficiaries to which [Plaintiffs] belong." *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 120 (2005).

The court's conclusion on this first factor is supported by *Brunner*. Although that case dealt with a separate provision of Section 303(a) of HAVA, the provision at issue there directed "[t]he chief State election official and the official responsible for the State motor vehicle authority of a State" to enter into an information sharing agreement. *Brunner*, 555 U.S. at 6 n.*. That provision is structurally indistinguishable from those at issue in this case. They all are designed to "guide the State" and its officials. *Blessing*, 520 U.S. at 344. They focus "on the person regulated," *Alexander*, 532 U.S. at 289, and there is no focus, much less an "unmistakable" one, *Cannon*, 441 U.S. at 691, on any identifiable class of beneficiaries or the Plaintiffs.

As to the second *Cort* factor, the court finds that Section 21083(a)(2)(A) and Section 21083(a)(5)(A)(i) contain no indication of legislative intent to imply a private remedy. This inquiry involves resort to legislative history, *Cort*, 422 U.S. at 80, an inherently perilous exercise akin to "looking over a crowd and picking out your friends," *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (quoting Patricia M. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 Iowa L. Rev. 195, 214 (1983)). But here, the relevant legislative history "is entirely silent on the question whether a private right of action . . . should or should not be available," and "implying a private right of action on the basis of congressional silence is a hazardous enterprise, at best." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 571 (1979); *see also* H.R. Rep. 107–329 (2001). If anything, "[t]his silence on the remedy question serves to confirm that in enacting [HAVA], Congress was concerned not with private rights but with" states' compliance with minimum standards of election administration. *Sierra Club*, 451 U.S. at 296.

Third, the court finds that implying a private right of action under these provisions of HAVA would not be consistent with the underlying purposes of the legislative scheme. *Cort*, 422, U.S. at 78. To the contrary, consideration of the legislative scheme as a whole leads the court to discern a legislative intent to deny a private remedy. On that point, HAVA contains "separate . . . enforcement mechanisms." *Indiana Prot. & Advoc. Servs. v. Indiana Fam. & Soc. Servs. Admin.*, 603 F.3d 365, 379 (7th Cir. 2010). Specifically, "[t]he Attorney General may bring a civil action against any State or jurisdiction in an appropriate United States District Court" to remedy violations of Section "21083 of this title." 52 U.S.C. § 21111. In addition, states that receive federal funding must "establish and maintain State-based administrative complaint procedures." 52 U.S.C.A. § 21112(a)(1). North Carolina has done so, N.C.G.S. § 163-91(a), and the concerned citizen took advantage of this complaint procedure, DE 1-3 at 12-14.

"The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Alexander*, 532 U.S. at 290; *see also Gonzaga*, 536 U.S. at 290 (finding that an express provision authorizing administrative enforcement "counsel[s] against [] finding a congressional intent to create individually enforceable private rights"). "After all, when Congress wants to create a private cause of action, it knows how to do so expressly." *Carey v. Throwe*, 957 F.3d 468, 479 (4th Cir. 2020). Congress's decision in HAVA to expressly create enforcement remedies other than a private right of action strongly suggests that it intended not to impliedly create a private right of action under the provisions at issue here.

The final *Cort* factor, whether "the cause of action [is] one traditionally relegated to state law," has no bearing in this case. *Cort*, 422 U.S. at 78. Although *Cort* identified several factors that could be relevant, it "did not decide that each of these factors is entitled to equal weight," and "[t]he central inquiry remains whether Congress intended to create, either expressly or by

30

implication, a private cause of action." *Touche Ross*, 442 U.S. at 575. Cases since *Cort* have similarly emphasized that the court's conclusion "must ultimately rest on congressional intent," *Virginia Bankshare*, 501 U.S. at 1102, that "[s]tatutory intent . . . is determinative," *Alexander*, 532 U.S. at 286, and that the dispositive factor is "the intent of Congress," *Texas Industries*, 451 U.S. at 639. The court adheres to those cases and finds that no implied right of action is available to these Plaintiffs under Section 21083(a)(2)(A) and Section 21083(a)(5)(A)(i) of HAVA. To the extent a remedy *should* be available to certain private parties, "the Legislature is in the better position" than a federal court "to consider if the public interest would be served by imposing a new substantive legal liability." *Ziglar*, 582 U.S. at 136.

### b. HAVA does evince congressional intent that federal courts would resolve disputes over its interpretation.

The conclusion that neither of the HAVA provisions at issue here provide a private right of action is relevant to the question of whether Count One presents a substantial federal question, but it is not dispositive. *Merrell Dow*, 478 U.S. at 814; *Grable*, 545 U.S. at 318. And the court finds that the absence of a private cause of action is at least partially counterbalanced by Section 21111, which authorizes "[t]he Attorney General [to] bring a civil action against any State or jurisdiction in an appropriate United States District Court" to remedy violations of Section "21083 of this title." 52 U.S.C. § 21111. At a minimum, then, Congress contemplated that federal courts would be responsible for resolving questions of statutory interpretation, even if not in actions brought by these Plaintiffs.

At bottom, the court finds that Count One raises a substantial question of federal law: does a state contravene its obligation to maintain voter registration lists under HAVA when it declines to remove voters for a basis not enunciated in the NVRA? That question of federal law is "not collateral, peripheral or remote." *Textile Workers*, 353 U.S. at 470 (Frankfurter, J., dissenting). It

31

is front and center, and is the critical legal or factual issue contested in the case. *Grable*, 545 U.S. at 315. And where the answer to that question may implicate the right to vote for North Carolinians in an imminent national election, and that right is "of the most fundamental significance under our constitutional structure," *Burdick*, 504 U.S. at 433, the court concludes that the duty of answering that question "sensibly belongs in a federal court," *Grable*, 545 U.S. 315.

### 4. *Federal-State Balance*

Lastly, the court has considered whether finding federal question jurisdiction over Count One would "disrupt[] the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. This is a practical, common-sense inquiry, which asks the court to project whether declaring the existence of subject matter jurisdiction over a particular state law claim will "attract[] a horde of original filings and removal cases raising other state claims" or "portend only a microscopic effect" on "the normal currents of litigation." *Grable*, 545 U.S. at 315, 318-19.

As far as the court can tell, no plaintiff has ever raised a direct claim under Section 163-82.11. According to a Westlaw search, the statute has only been cited in two previous court decisions, one of which was this court's order denying the North Carolina NAACP's motion to intervene. *Republican National Committee and North Carolina Republican Party v. North Carolina State Board of Elections et al.*, No. 5:24-CV-00547, 2024 WL 4349904 (E.D.N.C. Sept. 30, 2024). In the absence of evidence suggesting that plaintiffs are regularly bringing these sorts of claims in state court, the court suspects that its narrow holding (which applies only to this specific provision of North Carolina law) will "portend only a microscopic effect" on "the normal currents of litigation." *Grable*, 545 U.S. at 315, 319.

Moreover, the court finds that exercising subject matter jurisdiction over this claim would not disrupt any congressionally-contemplated allocation of authority between state and federal

32

courts. *See Gunn*, 568 U.S. at 258. Congress did grant states discretion in implementing HAVA. 52 U.S.C. § 21085. But implementation is distinct from interpretation, and consideration of the entire statutory scheme leads to the conclusion that Congress intended for federal courts to resolve core questions of statutory interpretation. *See* 52 U.S.C. § 21111. Although the court has no doubt that a state court could capably interpret the provisions of HAVA, there is no indication that Congress intended that outcome to the exclusion of federal court jurisdiction. "[I]f anything," then, "the removal [in this action] could best be said to have righted th[e] intended division" between state and federal courts. *Old Dominion Elec. Coop. v. PJM Interconnection, LLC*, 24 F.4th 271, 288 (4th Cir. 2022).

In sum, the court finds that Count One necessarily raises a disputed and substantial issue of federal law, and that its resolution in federal court would not disrupt the federal-state balance approved by Congress. *Gunn*, 568 U.S. at 258. The court may therefore exercise subject matter jurisdiction over Count One (and supplemental jurisdiction over Count Two). 28 U.S.C. § 1331; 28 U.S.C. § 1367. Accordingly, removal was proper, 28 U.S.C. § 1441(a), and the motion to remand is denied.

### iii. Removal Jurisdiction under 28 U.S.C. § 1443(2)

Defendants also offer Section 1443(2) as an alternative basis for removal. *See* DE 1 at 2. As previously detailed, that provision permits removal for a civil action that involves "any act under color of authority derived from any law providing for equal rights," or the refusal "to do any act on the ground that it would be inconsistent with such law." 28 U.S.C. § 1443(2). Defendants proceed under the second portion of Section 1443(2), known as the refusal clause. *Stephenson*, 180 F. Supp. 2d at 785 (explaining that refusal clause "provides that state officers can remove to federal court if sued for refusing to do any act on the ground that it would be inconsistent with any

33

law providing for civil rights") (internal brackets and quotation marks omitted). According to Defendants, "[t]o the extent [they] have indeed refused to take certain actions, their refusal was based on their obligation to comply with 52 U.S.C. § 10101(a)(2) and 52 U.S.C. § 20507(c)(2)(A)." DE 1 at 2. This refusal applies to each of Counts 1 and 2, because Defendants' obligations under the NVRA constitute a defense to both claims.

Section 20507(c)(2)(A) requires that a state complete any systematic removal of ineligible voters "not later than 90 days prior to the date of a . . . general election." 52 U.S.C. § 20507(c)(2)(A). Section 10101(a)(2) has several sub-provisions but, relevant here, prohibits a state official from "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting," so long as that "error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). Based on those provisions, the court understands Defendants' theory to be that, if they were to grant Plaintiffs the relief they seek, Defendants would violate certain provisions of the NVRA. *See* DE 1 at 2.

The problem with this theory is that the "[t]he Supreme Court has limited the meaning of a 'law providing for equal rights' in § 1443 to only those concerning racial equality." *Vlaming*, 10 F.4th at 309. The *Rachel* Court concluded that the statutory language "must be construed to mean any law providing for specific civil rights *stated in terms of racial equality*." *Rachel*, 384 U.S. at 792 (emphasis added). Laws "phrased in terms of general application available to all persons or citizens," and not in "specific language of racial equality," do not grant removal jurisdiction under Section 1443. *Id.* Although "the plain text of the statute suggests a broader interpretation," this court "must take the Supreme Court at its word and faithfully apply its precedent." *Vlaming*, 10 F.4th at 310.

Neither Section 20507(c)(2)(A) nor Section 10101(a)(2)(B) provide "for specific civil rights stated in terms of racial equality." *Rachel*, 384 U.S. at 792. Section 20507(c)(2)(A) makes no mention of race and is "phrased in terms of general application available to all persons." *Id.*; *see also* 52 U.S.C. § 20507(c)(2)(A). And, although Section 10101(a)(2)(B) is contained in a provision entitled "Race, color, or previous condition not to affect right to vote; uniform standards for voting qualifications; errors or omissions from papers," *see* 52 U.S.C. § 10101(a), only Section 10101(a)(1) provides "for specific civil rights stated in terms of racial equality," *Rachel*, 384 U.S. at 792. *See also* 52 U.S.C. § 10101(a)(1) (providing that "All citizens of the United States who are otherwise qualified by law to vote . . . shall be entitled and allowed to vote . . ., without distinction of race, color, or previous condition of servitude").

Section 10101(a)(2)(B), the provision on which Defendants based their refusal to act, does not mention race and is "phrased in terms of general application available to all persons." *Rachel*, 384 U.S. at 792; *see also* 52 U.S.C. § 10101(a)(2)(B). The inclusion of "Race" and "color" in the title of the provision does not alter the court's conclusion because the title of a statute cannot modify its plain text. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998). A statute's heading "is but a short-hand reference to the general subject matter involved." *Brotherhood of R. R. Trainmen v. Baltimore & O. R. Co.*, 331 U.S. 519, 528 (1947). And where, as here, the statute's title includes a series of semicolons, that use is intended to highlight "distinct" topics. *See Williams v. CDP, Inc.*, 474 F. App'x 316, 321 n.4 (4th Cir. 2012); *see also United States v. Waters*, 158 F.3d 933, 937 (6th Cir. 1998) (noting that semicolon in statute's title "strongly suggests" that provisions of statute address "separate areas"). Accordingly, the court must resort to the plain text to determine whether the relevant statutory provision mentions "specific civil rights stated in terms of racial equality." *Rachel*, 384 U.S. at 792. Section 10101(a)(2)(B) does not.

35

Defendants and the DNC argue that the NVRA "indisputably has as one of its purposes the promotion of racial equality." DE 51 at 19; *see also* DE 49 at 9 (asserting that NVRA provides for civil rights in terms of racial equality). And the court acknowledges that one of the (several) congressional findings in the first chapter of the NVRA indicates that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3). But Defendants' position and this general congressional finding, though true, would improperly reframe the pertinent test at too great a level of generality. The test is not whether Defendants refused to act on the basis of a provision of law that is contained within a larger statute that has several purposes, one of which being racial equality. The test is whether the refusal to act was based on a law that is "stated in terms of racial equality." *Rachel*, 384 U.S. at 792. Because Section 1443(2) "constitute[s] a congressionally authorized encroachment by the federal court upon the sovereignty of the state courts," it must "be strictly construed." *People of State of N.Y. v. Mitchell*, 637 F. Supp. 1100, 1102 (S.D.N.Y. 1986); *see also Davis v. Glanton*, 107 F.3d 1044, 1047 (3d Cir. 1997) ("the jurisprudence" concerning Section 1443 "has made clear that Congress has crafted only a narrow exception to the rule that a state court action may be removed to a federal district court only if federal jurisdiction is evident on the face of the plaintiff's well-pleaded complaint").

A relevant analogue the court has identified in the case law involves attempted removal under Section 1443 where a defendant's counterclaim arises under the Fair Housing Act ("FHA"). The FHA does provide for civil rights expressed in terms of racial equality. *See* 42 U.S.C. § 3604(a). But FHA claims can also center on protected characteristics other than race. *See id.* And courts have routinely rejected removal of FHA counterclaims under Section 1443 when those

36

counterclaims do not implicate racial discrimination. *E.g.*, *Water's Edge Habitat, Inc. v. Pulipati*, 837 F. Supp. 501, 504–05 (E.D.N.Y. 1993) (citing *Rachel* and finding removal improper under Section 1443 because, although defendant cited to the FHA, a law providing for civil rights, the allegations supporting removal involved disparate treatment "based upon familial status"); *Henlopen Landing Homeowners Ass'n, Inc. v. Vester*, No. 12-CV-308, 2013 WL 1704889, at *5 (D. Del. Apr. 19, 2013) (for purposes of Section 1443, distinguishing between FHA "claim premised [] on acts of alleged race-based discrimination," which would support removal, and claims "premised on other forms of discrimination (such as that due to familial status or handicap)," which would not support removal), *recommendation adopted*, No. 12-CV-308, 2013 WL 10974212 (D. Del. May 14, 2013); *Sky Lake Gardens No. 3, Inc. v. Robinson*, No. 96-CV-1412, 1996 WL 944145, at *5 (S.D. Fla. July 24, 1996) (same).

Like the FHA, certain provisions of the NVRA are expressed in terms of racial equality. 52 U.S.C. § 10101(a)(1). But others are not. 52 U.S.C. § 10101(a)(2)(B); 52 U.S.C. § 20507(c)(2)(A). What the cases involving the FHA teach is that it is not enough for defendants to generally reference a law that provides for civil rights in terms of racial equality to establish removal jurisdiction under Section 1443. Rather, the defendants must show that their refusal to act would be inconsistent with a law providing for civil rights that is "stated in terms of racial equality." *Rachel*, 384 U.S. at 792; *see also* 28 U.S.C. § 1443(2); *cf. White v. Wellington*, 627 F.2d 582, 586 (2d Cir. 1980) (holding that Section 1443(2) "may be invoked when the removing defendants make a colorable claim that they are being sued for not acting" in a manner that "would produce or perpetuate a racially discriminatory result"). Put another way, the party seeking removal must cite a civil rights statute that deals in terms racial equality *and* make some showing that their refusal to act actually involves considerations of racial equality or discrimination. *See*

*Davis*, 107 F.3d at 1049 (explaining that removal under Section 1443 on the basis of 42 U.S.C. § 1985(3) "would be improper" if removing defendants were "using the vehicle of a § 1985 claim to protect their First Amendment rights," notwithstanding that Section 1985(3) also "protect[s] specifically against race-based discrimination").

Here, Defendants' refusal to act was not based on any provision of federal law that employs language concerning racial equality. Instead, Defendants base their refusal to act on 52 U.S.C. § 10101(a)(2) and 52 U.S.C. § 20507(c)(2)(A). DE 1 at 2. Those statutory provisions do not mention race and are "phrased in terms of general application available to all persons." *Rachel*, 384 U.S. at 792.

In short, Defendants' refusal to act does not have "anything to do with racial equality which is essential for removal under" Section 1443(2). *Shelly v. Com. of Pa.*, 451 F. Supp. 899, 900 (M.D. Pa. 1978). "[B]ecause [Defendants] ha[ve] not raised issues related to racial equality, the[y] cannot remove this case pursuant to § 1443(2)." *Vlaming v. W. Point Sch. Bd.*, 480 F. Supp. 3d 711, 724 (E.D. Va. 2020), *aff'd*, 10 F.4th 300 (4th Cir. 2021); *see also Arizona v. $8,025.00 in U.S. Currency*, No. 21-CV-01278, 2021 WL 5084187, at *4 (D. Ariz. Nov. 2, 2021) (explaining that district courts are "bound [by *Rachel*] to limit" Section 1443 "to removal proceedings where racial inequality is specifically at issue"); *Osborne v. Osborne*, 554 F. Supp. 566, 568 (D. Md. 1982) (reiterating that only allegations "based upon racial grounds merit § 1443 federal removal jurisdiction").

If the court were ruling on a blank slate, it might reach a different conclusion. In that regard, and like the Fourth Circuit, this court does not necessarily "endorse *Rachel's* reasoning or conclusion," but it is "bound to apply it." *Vlaming*, 10 F.4th at 311. And after according due weight to the principle that removal statutes are to be strictly construed, *Shamrock Oil*, 313 U.S.

38

at 109, the court adheres to *Rachel* and finds that Defendants have not met their burden in establishing removal jurisdiction under Section 1443(2) because their refusal to act has nothing to do with considerations of race. *See also Vlaming*, 10 F.4th at 309 (interpreting *Rachel* for proposition that "racial equality [i]s the sole subject" of Section 1443). The court thus concludes that it may only maintain subject matter jurisdiction over this action pursuant to Section 1331 and Section 1441(a). With that jurisdictional posture in mind, the court turns to the merits.

### b. Motion to Dismiss

#### i. Count One

Defendants raise several arguments in support of dismissal of Count One. DE 31 at 12-21. They argue that the claim is barred by laches. *Id.* at 12-16. They also argue that Plaintiffs fail to state a claim for relief in part because Section 163-82.11 provides no private "cause of action." *Id.* at 16. This latter argument has merit, so the court does not need to reach the former. *See Warner v. Scotland Cnty. Soc. Servs.*, No. 1:22-CV-676, 2023 WL 2992423, at *1 (M.D.N.C. Mar. 22, 2023) ("A plaintiff fails to state a claim upon which relief may be granted when the complaint cites as its basis a [] statute that confers no private right of action."), *recommendation adopted*, No. 1:22-CV-676, 2023 WL 2990360 (M.D.N.C. Apr. 18, 2023); *see also Carey*, 957 F.3d at 483.

Although this private cause of action inquiry turns to a separate body of law than the court's analysis related to HAVA, *see supra* at 26-31, it reaches the same conclusion. Section 163-82.11 does not expressly provide a private cause of action, and typically "a statute allows for a private cause of action *only* where the legislature has expressly provided a private cause of action within the statute." *Time Warner*, 228 N.C. App. at 516, 747 S.E.2d at 615 (emphasis added). Sometimes a statute impliedly provides a private right of action, but state court decisions finding the existence of one have based their holdings on clear statutory language that directs one party to take some

39

action for the benefit of an identified group. *Sugar Creek*, 195 N.C. App. at 357, 673 S.E.2d at 674; *Williams*, 128 N.C. App. at 604, 495 S.E.2d at 409.

Unlike in *Sugar Creek* and *Williams*, here Section 163-82.11 does not express any intent to provide a benefit to a discrete group (such as charter schools in *Sugar Creek*, or teachers in *Williams*). The statute is devoid of reference to voters, registrants, or applicants; it simply directs the NCSBE to "update the statewide computerized voter registration list and database to meet the requirements of section 303(a) of the Help America Vote Act of 2002." N.C.G.S. § 163-82.11(c). The statute "do[es] not enunciate an explicit or implicit intent on the part of the General Assembly to create a statutory protection for" a particular group; therefore, the court is not free to fashion an implied right of action. *Lea*, 156 N.C. App. at 509, 577 S.E.2d at 416.

The conclusion that Section 163-82.11 does not confer a private right of action is further supported by an existing administrative enforcement regime made available under state law. North Carolina has enacted a HAVA complaint procedure, N.C.G.S. § 163-91(a), and the concerned citizen took advantage of this procedure, DE 1-3 at 12-14. The existence of this separate enforcement process indicates that there is "no legislative implication" that the statute "allow[s] for enforcement [in court] by a private party." *Sykes*, 372 N.C. at 338, 828 S.E.2d at 474–75; *see also Cobb*, 215 N.C. App. at 281, 715 S.E.2d at 552.

Under North Carolina law, "implied rights of action are disfavored and will not be found in the absence of clear legislative intent." *Long*, 145 N.C. App. at 188, 548 S.E.2d at 834. With regard to Section 163-82.11, that clear legislative intent is lacking, and the court acknowledges that "[t]he regulation of access to the courts is largely a legislative task and one that courts should hesitate to undertake." *Id.* Staying true to those principles, the court finds that Section 163-82.11 confers no private cause of action.

The court further finds that Plaintiffs' styling of Count One as a claim seeking a "writ of mandamus" cannot save the claim in the absence of a private right of action. A writ of mandamus is "an extraordinary court order" that will only issue where a plaintiff can demonstrate "a clear legal right" to relief. *Graham Cnty. Bd. of Elections v. Graham Cnty. Bd. of Comm'rs*, 212 N.C. App. 313, 322, 712 S.E.2d 372, 379 (2011). Where, as here, Section 163-82.11(c) does not confer a private right of action, Plaintiffs cannot show a clear legal right to relief. *In re T.H.T.*, 362 N.C. 446, 453, 665 S.E.2d 54, 59 (2008) (emphasizing that "courts may only issue mandamus to enforce established rights, not to create new rights").

In addition, "mandamus is not a proper instrument to review or reverse an administrative board which has taken final action on a matter within its jurisdiction." *Warren v. Maxwell*, 223 N.C. 604, 608, 27 S.E.2d 721, 724 (1943). In the present case, the concerned citizen raised a complaint to the NCSBE in a manner contemplated by state law. DE 1-3 at 12-14; N.C.G.S. § 163-91(a). Defendants rendered a final decision in response to that complaint, and "[a]n action for mandamus may not be used as a substitute for an appeal." *Snow v. N. Carolina Bd. of Architecture*, 273 N.C. 559, 570, 160 S.E.2d 719, 727 (1968).[7] To the extent "the statute provides no appeal-the proper method of review is by certiorari." *Warren*, 223 N.C. at 608, 27 S.E.2d at 724. The court thus finds that mandamus is unavailable to Plaintiffs under the circumstances.

Plaintiffs make two arguments in response, but neither is availing. First, they contend that mandamus is available, citing the recent North Carolina Supreme Court decision in *Committee to Elect Dan Forest v. Employees Political Action Committee*. DE 50 at 10-12. But the question presented in that case was whether the plaintiff had suffered an injury in fact sufficient to "have

---

[7] The court notes that Plaintiffs were not a party to the administrative complaint to the NCSBE. This creates a two-fold mandamus problem for Plaintiffs because, in essence, they are appealing a decision they did not solicit and are seeking a court order that Defendants do something that Plaintiffs never requested of them in the first instance.

41

standing to sue under the North Carolina Constitution." *Comm. to Elect Dan Forest v. Emps. Pol.*

*Action Comm.*, 376 N.C. 558, 563, 853 S.E.2d 698, 704 (2021). There, unlike here, the statute in

question "included a notable enforcement mechanism," which expressly granted a private right of

action to certain parties. *Id.* at 560, 702-03 (citing N.C.G.S. § 163-278.39A(f)). Accordingly, the

Court's discussion regarding writs of mandamus, along with the acknowledgement that such writs

may be available to "vindicat[e] public rights common to all citizens," *Id.* at 575, 712, is irrelevant

here because Section 163-82.11 does not grant (expressly or impliedly) a cause of action to private

parties.[8]

Alternatively, Plaintiffs assert that *Pullman* abstention is warranted. DE 50 at 4-5. But

that "extraordinary and narrow" doctrine of constitutional avoidance is inapposite. *Quackenbush*

*v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996). "To apply the *Pullman* doctrine, at a minimum it

must appear that there is (1) an unclear issue of state law presented for decision" and that resolution

of the state law issue (2) "may moot or present in a different posture the *federal* constitutional

issue such that the state law issue is potentially dispositive." *Educational Servs., Inc. v. Maryland*

*State Bd. for Higher Educ.*, 710 F.2d 170, 174 (4th Cir. 1983) (emphasis added).

Count One does not meet either prong of *Pullman*. Nothing in Section 163-82.11 is

"unclear or ambiguous," *North Carolina State Conf. of NAACP v. Cooper*, 397 F. Supp. 3d 786,

795 (M.D.N.C. 2019), and "abstention is not indicated if the state law is clear on its face," 17A

CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 4242, at 331–32 (3d ed.

2007). *See also Wisconsin v. Constantineau*, 400 U.S. 433, 439 (1971) ("Where there is no

---

[8] Contrary to Plaintiffs' position that *Committee to Elect Dan Forest* loosened the standards for obtaining mandamus relief in North Carolina state courts, the year after that decision the North Carolina Supreme Court reaffirmed that mandamus relief is only available where "the petitioner possesses a clear and established legal right to the act to be commanded." *State v. Diaz-Tomas*, 382 N.C. 640, 652, 888 S.E.2d 368, 378 (2022).

ambiguity in the state statute, the federal court should not abstain."). Moreover, there is no federal constitutional issue presented in this action. *Pullman* doesn't apply.

In reaching its conclusion that Count One fails on the merits, the court is not insensitive to Plaintiffs' concerns about election integrity and voter disenfranchisement. Nor is its decision in any way a stamp of approval on Defendants' conduct. But "[r]aising up causes of action where a statute has not created them" is "for common-law courts," not this "federal tribunal[]." *Lampf*, 501 U.S. at 365 (Scalia, J., concurring). In the absence of any indication that North Carolina's General Assembly intended for private litigants to enforce the provisions of Section 163-82.11, this court may not appoint itself as "oversee[r]" of "executive action," *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009), which "would significantly alter the allocation of power . . . away from a democratic form of government," *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring). Defendants' motion to dismiss is granted as to Count One in the Complaint.

### ii. Count Two

Defendants also move to dismiss Count Two, which raises a direct claim under the North Carolina Constitution. DE 31 at 21-25. At this point, Count Two is the only remaining claim, so it "substantially predominates" in this action; the court "has dismissed all claims over which it ha[d] original jurisdiction." 28 U.S.C. § 1367(c)(1) & (c)(3). In addition, the claim raises a "novel" issue of North Carolina law (whether the State's noncompliance with state and federal election law can give rise to state constitutional injury). 28 U.S.C. § 1367(c)(2). The court further finds "compelling [federalism] reasons for declining" to exercise supplemental jurisdiction over Count Two, namely that state courts should decide the scope and extent of state constitutional rights. 28 U.S.C. § 1367(c)(4); *National Tea*, 309 U.S. at 557 (recognizing that "state courts" must

43

"be left free and unfettered by [federal courts] in interpreting their state constitutions"). Accordingly, the court declines to exercise supplemental jurisdiction over Count Two and remands that claim to state court, which will "best promote the values of economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 353 (1988) (recognizing district court's "wide discretion" to remand previously-removed state law claims to state court after dismissal of federal claims); *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 617 (4th Cir. 2001) (affirming decision to remand where remaining state claims involved "complex" issues for which "there was no State precedent").

## IV.    CONCLUSION

Plaintiffs' emergency motion to remand [DE 37] is DENIED.  Defendants' motion to dismiss [DE 30] is GRANTED IN PART.  Count One is DISMISSED WITH PREJUDICE, and the court exercises its inherent authority to REMAND Count Two to state court.  The court's remand order is STAYED until October 22, 2024, so that the parties may seek an appeal if they so choose.

SO ORDERED this 17th day of October, 2024.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

44