**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 24-2044**

───────────────

REPUBLICAN NATIONAL COMMITTEE; NORTH CAROLINA
REPUBLICAN PARTY,

                    Plaintiffs – Appellees,

        v.

NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON
BELL, in her official capacity as Executive Director of the North Carolina State
Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North
Carolina State Board of Elections; JEFF CARMON, in his official capacity as
Secretary of the North Carolina State Board of Elections; STACY EGGERS, IV, in
their official capacities as Members of the North Carolina State Board of Elections;
KEVIN N. LEWIS, in their official capacities as Members of the North Carolina
State Board of Elections; SIOBHAN O'DUFFY MILLEN, in their official
capacities as Members of the North Carolina State Board of Elections,

                    Defendants – Appellants,

        and

DEMOCRATIC NATIONAL COMMITTEE,

                    Intervenor/Defendant.

------------------------------

JACKSON SAILOR JONES; BERTHA LEVERETTE; NORTH CAROLINA
STATE CONFERENCE OF THE NAACP,

                    Amici Supporting Appellant.

---

**No. 24-2045**

---

REPUBLICAN NATIONAL COMMITTEE; NORTH CAROLINA REPUBLICAN PARTY,

          Plaintiffs – Appellees,

    v.

DEMOCRATIC NATIONAL COMMITTEE,

          Intervenor/Defendant – Appellant,

    and

NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; STACY EGGERS, IV, in their official capacities as Members of the North Carolina State Board of Elections; KEVIN N. LEWIS, in their official capacities as Members of the North Carolina State Board of Elections; SIOBHAN O'DUFFY MILLEN, in their official capacities as Members of the North Carolina State Board of Elections,

          Defendants.

---

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Richard E. Myers, Chief District Judge. (5:24-cv-00547-M-RJ)

---

Argued: October 28, 2024            Decided: October 29, 2024

---

Before DIAZ, Chief Judge, GREGORY and BERNER, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Berner wrote the opinion, in which Chief Judge Diaz and Judge Gregory joined. Chief Judge Diaz wrote a concurring opinion.

2

---

**ARGUED:** Sarah Gardner Boyce, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina; Seth Paul Waxman, WILMERHALE LLP, Washington, D.C., for Appellants. Phillip John Strach, NELSON MULLINS RILEY & SCARBOROUGH, LLP, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Jim W. Phillips, Jr., Shana L. Fulton, Eric M. David, William A. Robertson, James W. Whalen, BROOKS, PIERCE, MCLENDON HUMPHREY & LEONARD, LLP, Raleigh, North Carolina; Daniel S. Volchok, Christopher E. Babbitt, Gary M. Fox, Joseph M. Meyer, Jane E. Kessner, Nitisha Baronia, WILMER CUTLER PICKERING HALE & DORR LLP, Washington, D.C., for Appellant Democratic National Committee. Sripriya Narasimhan, Deputy General Counsel, Mary Carla Babb, Terence Steed, Special Deputy Attorney General, South A. Moore, Deputy General Counsel, Marc D. Brunton, General Counsel Fellow, NORTH CAROLINA DEPARTMENT OF JUSTICE, for Appellants North Carolina State Board of Elections; Karen Brinson Bell; Alan Hirsch; Jeff Carmon; Stacy Eggers, IV; Kevin Lewis; and Siobhan O'Duffy Millen. Jordan A. Koonts, NELSON MULLINS RILEY & SCARBOROUGH LLP, Raleigh, North Carolina, for Appellees. Jeffrey Loperfido, Hilary H. Klein, Christopher Shenton, SOUTHERN COALITION FOR SOCIAL JUSTICE, Durham, North Carolina; Ezra D. Rosenberg, Jennifer Nwachukwu, Pooja Chaudhuri, Alexander S. Davis, Javon Davis, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, Washington, D.C.; Lee Rubin, Palo Alto, California, Rachel J. Lamorte, Catherine Medvene, Washington, D.C., Jordan Hilton, Salt Lake City, Utah, Harsha Tolappa, MAYER BROWN LLP, Chicago, Illinois, for Amici North Carolina NAACP, Jackson Sailor Jones, and Bertha Leverette.

---

3

BERNER, Circuit Judge:

This appeal concerns whether remand of a claim to state court was proper. The Republican National Committee ("RNC") and the North Carolina Republican Party ("NCGOP") (together, "Plaintiffs") filed two state law claims, one statutory and one constitutional, in a North Carolina superior court against the North Carolina State Board of Elections and its members ("State Board"). Both claims stemmed from the State Board's alleged noncompliance with the Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. § 20901 *et seq.*, a federal statute that was intended to improve voting systems and voter access.

The Democratic National Committee ("DNC") intervened as a defendant. Together, the DNC and the State Board ("Defendants") removed the action to federal court pursuant to 28 U.S.C. §§ 1441 and 1443(2) and filed a motion to dismiss both claims. Under 28 U.S.C. § 1441, defendants may remove to federal court those claims over which federal courts possess original jurisdiction, including federal question jurisdiction under 28 U.S.C. § 1331. Title 28 of the United States Code, Section 1443, allows defendants to remove to federal court certain claims involving federal equal rights laws.

The district court held that it possessed original jurisdiction over Plaintiffs' state statutory claim but lacked original jurisdiction over the state constitutional claim. The district court then granted Defendants' motion to dismiss the statutory claim because the relevant statutory provision does not provide for a private right of action. Following dismissal of the state statutory claim, the district court declined to exercise supplemental jurisdiction over the remaining state constitutional claim. It also held that Section 1443 did

4

not provide a valid basis for removal. As a result, the district court remanded the constitutional claim to state court.

We hold that the district court's remand order was improper for two reasons. First, the district court possessed original jurisdiction over the state constitutional claim under Section 1331, as the claim contains an embedded federal question. Removal was thus permissible under Section 1441. Second, Defendants validly removed the constitutional claim pursuant to Section 1443(2), which allows for removal in cases involving the "refus[al] to do any act on the ground that it would be inconsistent with" "any law providing for equal rights." 28 U.S.C. § 1443(2). Here, the State Board refused to perform Plaintiffs' requested act—striking certain registered voters from North Carolina's voter rolls—on the ground that doing so within 90 days of a federal election would violate provisions of Title I of the Civil Rights Act of 1964, Pub. L. No. 88-352, § 101, 78 Stat. 241, 241-42 (July 2, 1964) (codified at 52 U.S.C. § 10101), and the National Voter Registration Act of 1993 ("NVRA"), Pub. L. No. 103-31, 107 Stat. 77 (May 20, 1993) (codified at 52 U.S.C. § 20501 *et seq.*). These are "law[s] providing for equal rights" within the meaning of Section 1443. We thus reverse the district court's remand order and return this matter to the district court for further proceedings consistent with this opinion.

I. Statement of Jurisdiction

A.  Organizational Standing

Though both parties agree that Plaintiffs possess Article III standing, we have "an independent obligation to assure that standing exists."[1] *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). An organization may have standing to sue on its own behalf for injuries it sustains as a result of a defendant's actions. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n. 19 (1982). To do so, however, a plaintiff must show "far more than simply a setback to the organization's abstract social interests." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) ("*Hippocratic Medicine*") (quoting *Havens Realty*, 455 U.S. at 379). Rather, the organization must make the necessary showing to demonstrate Article III standing—an injury-in-fact, caused by the defendant, that can be redressed by a favorable decision from the court. *Id*. at 393-94. "A federal court cannot ignore this requirement without overstepping its assigned role in our system of adjudicating only actual cases and controversies." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 39 (1976).

  1.  *Injury-in-Fact*

The Supreme Court set forth the standard for organizational standing in *Havens Realty*.  *See generally Havens Realty*, 455 U.S. at 378-79. There, the Court held that an

---

[1] Defendants asserted that organizational standing provides a basis for federal jurisdiction. Plaintiffs equivocated on the issue but ultimately conceded at oral argument that they likely possess associational standing. We agree with the concurrence that Plaintiffs lack associational standing.

6

organization whose core mission included providing housing counseling services had standing to sue a real estate company that engaged in racial steering. *Id*. The Court found that the organization suffered an injury-in-fact because the company's racial steering "perceptibly impaired" the organization's ability to provide a key component of the organization's mission. *Id.* at 379.

This court has applied *Havens Realty*'s organizational standing principles on numerous occasions. We have recognized that "when an action 'perceptibly impair[s]' an organization's ability to carry out its mission and 'consequent[ly] drain[s] . . . the organization's resources,' 'there can be no question that the organization has suffered' an injury-in-fact.'" *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 301 (4th Cir. 2020) (alterations in original) (quoting *Havens Realty*, 455 U.S. at 379); *see also People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md., Inc.*, 843 F. App'x 493, 496-97 (4th Cir. 2021) ("PETA") (holding that PETA had standing because its diversion of resources in response to defendant's actions impeded the organization's "efforts to carry out its mission").

At the same time, we have recognized limitations to organizational standing. In *Lane v. Holder*, we noted that "mere expense" does not constitute an injury in-fact where the decision to divert resources is not in response to a threat to the organization's core mission. 703 F.3d 668, 675 (4th Cir. 2012). We have consistently held that standing cannot be established on the sole basis of an organization's uncompelled choice to expend resources. *See, e.g.*, *N.C. State Conf. of the NAACP*, 981 F.3d at 301 ("[T]he *Havens Realty* standard is not met simply because an organization makes a 'unilateral and uncompelled'

choice to shift its resources away from its primary objective to address a government action."); *S. Walk at Broadlands Homeowner's Ass'n  v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 183 (4th Cir. 2013) (organization lacked standing because it failed to allege that the defendant's actions "frustrate[d] its stated organizational purpose"); *PETA*, 843 F. App'x at 497 ("PETA did not allege or prove that its injury consisted of the costs associated with the instant lawsuit, but, rather, satisfied *Havens Realty* by alleging and proving that Defendants' actions impaired its ability to carry out its mission combined with a consequent drain on its resources.").

The Supreme Court addressed organizational standing most recently in *Hippocratic Medicine*, where several medical advocacy organizations opposed to abortion, together with individual doctors, sued the Food and Drug Administration ("FDA") to challenge the agency's approval of the abortion-inducing drug mifepristone. *Hippocratic Med.*, 602 U.S. at 376, 395. The plaintiffs asserted standing on the basis that they (1) incurred costs to conduct studies so they could inform their members and the public about risks posed by mifepristone, (2) drafted citizen petitions to the FDA, and (3) engaged in public advocacy and public education. *Id*. at 394. The medical advocacy organizations argued that they established standing under *Havens Realty* because they had diverted resources in response to the FDA's actions. *Id*. at 394-95. The Court rejected that argument and explicitly declined to "extend the *Havens* holding beyond its context." *Id*. at 396. The Court held that the organizations lacked organizational standing because they failed to allege that the FDA's actions imposed an impediment to their advocacy similar to the impediment imposed in *Havens Realty*. *Id*. at 395. Instead, the organizations expended resources only

relevant to "abstract social interests" in response to the FDA's approval of mifepristone, and not to their core mission. *Id.* at 394.

This case involves more than simply an organization's efforts to "spend its way into standing." *Id.* at 394. Here, Plaintiffs together allege that "Defendants' actions and inaction directly impact Plaintiffs' core organizational missions of election security and providing services aimed at promoting Republican voter engagement and electing Republican candidates for office." J.A. 26. Plaintiffs allege that the RNC's "core mission involves organizing lawful voters and encouraging them to support Republican candidates at all levels of government" and that it "expends significant time and resources fighting for election security and voting integrity across the nation." J.A. 25. As for the NCGOP, Plaintiffs allege that the organization's "core mission includes counseling interested voters and volunteers on election participation including hosting candidate and voter registration events, staffing voting protection hotlines, investigating reports of voter fraud and disenfranchisement." J.A. 25-26. Plaintiffs contend that the State Board's violations of HAVA forced them to "divert significantly more of their resources into combatting election fraud in North Carolina," efforts which have frustrated their organizational and voter outreach efforts. J.A. 26. Under Supreme Court precedent, and that of this court, these allegations suffice to allege organization injury under Article III.

In *Havens Realty,* the plaintiff's core mission included counseling low- and moderate-income home buyers. Similarly here, the core mission of the RNC and the NCGOP is to counsel voters to support Republican candidates. Plaintiffs contend that this core mission is directly "affected and interfered with," *see Hippocratic Med.*, 602 U.S. at

9

395, because Plaintiffs are unable to ascertain which of the 225,000 people whom they allege registered improperly will be able to vote in the upcoming election. Plaintiffs claim they have already spent significant resources and seen their mission frustrated by the inaction of the State Board in remedying the alleged defects in the voter rolls. They claim that their "organizational and voter outreach efforts"—which, for the RNC, are on a national scale—"have been and will continue to be significantly stymied due to Defendants' ongoing failures." J.A. 26. Plaintiffs sufficiently allege that the State Board's failure to act has concretely impaired their core missions.

### 2. *Causation*

The allegations in Plaintiffs' Complaint also satisfy the other standing requirements—causation and redressability. To prove causation, Plaintiffs must show that their injury can be traced to the State Board's actions, and did not result from the independent action of a non-party to the case. *Bishop v. Bartlett*, 575 F.3d 419, 425 (4th Cir. 2009) (citing *Simon*, 426 U.S. at 41-42). Here, Plaintiffs allege the State Board's failure to comply with HAVA forced them to divert resources into combatting election fraud and monitoring various aspects of the upcoming election in North Carolina. Their injury is therefore traceable to State Board's conduct.

### 3. *Redressability*

To satisfy the redressability prong, Plaintiffs must show that it is likely, and not merely speculative, that a favorable decision from the federal court will remedy their injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The burden under this prong is "not onerous" and requires Plaintiffs to show only that they "personally would benefit

10

in a tangible way from the court's intervention." *Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 903 (4th Cir. 2022). To that end, we have stated that "[t]he removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability." *Id*.

Plaintiffs ask the court to "immediately and permanently rectify th[e] harm" they suffered as a result of the State Board's failure to comply with HAVA "in order to protect the integrity of North Carolina's elections." J.A. 40. More specifically, Plaintiffs ask the court to order the State Board to remove all voter registrants who did not provide their driver's license number or the last four digits of their social security number on their application or, alternatively, to require those individuals to vote provisionally. Such an order would address Plaintiffs' alleged injury and permit them to reallocate their resources accordingly. Thus, a favorable decision would redress Plaintiffs' injury.

Therefore, we find that Plaintiffs have standing to proceed in federal court.

B. Removal Jurisdiction

Appellate review of a district court order remanding a removed case to state court is circumscribed by Section 1447(d) of Title 28 of the United States Code. When remand is based on a lack of subject-matter jurisdiction, review of the remand order is typically barred. *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 638 (2009).

In passing the Civil Rights Act of 1964, however, Congress created an exception to the Section 1447(d) general rule barring appellate review of a remand order. Title IX of the Civil Rights Act of 1964, Pub. L. No. 88-352, § 901, 78 Stat. 241, 266 (July 2, 1964). When an appeal involves an order remanding a case to the state court from which it was removed

pursuant to Section 1443, the general bar to appellate review of a remand order does not apply. *BP P.L.C. v. Mayor of Balt.*, 593 U.S. 230, 241-42 (2021) (discussing the exception to Section 1447).

Our review of the remand order is not confined to the argument for removal under Section 1443. *Id.* at 236-37. We may properly review "the whole of a district court's 'order,' not just some of its parts or pieces." *Id.* at 237. Indeed, we are required to "review the merits of all theories for removal that a district court has rejected." *Id.* at 236. In this case, that includes whether jurisdiction was proper under 28 U.S.C. §§ 1331, 1443, or 1367.[2]

## II. Standard of Review

We review *de novo* questions of subject-matter jurisdiction, including removal. *Mayor of Balt. v. BP P.L.C.*, 31 F.4th 178, 197 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023). "The party seeking removal bears the burden of showing removal is proper." *Id.* (quoting *Prince v. Sears Holdings Corp.*, 848 F.3d 173, 176 (4th Cir. 2017)). "Because removal jurisdiction raises significant federalism concerns, we must strictly construe removal jurisdiction." *Id.* (quoting *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994)).

---

[2] We also possess jurisdiction to review the remand order on an alternate ground: the district court declined to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(c). "When a district court remands claims to a state court after declining to exercise supplemental jurisdiction, the remand order is not based on a lack of subject-matter jurisdiction." *Carlsbad*, 556 U.S. at 641. As discussed above, Section 1447(d) "interposes no bar to appellate review" where remand is not due to a lack of subject-matter jurisdiction. *Quackenbush v. Allstate Ins.*, 517 U.S. 706, 711-12 (1996).

III. Factual Background

On August 23, 2024, Plaintiffs filed a two-count Complaint in a North Carolina superior court. Though brought under state law, the entire lawsuit—as pled—turns on whether Defendants violated HAVA. The Plaintiffs contend in their Complaint that the State Board "violated HAVA and, as a result, state law." J.A. 156.

The alleged HAVA violations that form the basis of the state law claims derive from concerns about the adequacy of a voter registration form which had been in use in North Carolina before December 2023. In accepting and processing voter registration applications, HAVA requires states to include "the applicant's driver's license number" or, if the applicant lacks a valid driver's license, "the last 4 digits of the applicant's social security number." HAVA § 21083(a)(5)(A) (hereinafter "Subsection (a)(5)(A)"). If an applicant possesses neither a valid driver's license nor a social security number, then the state must "assign the applicant a number which will serve to identify the applicant for voter registration purposes." *Id*.

Plaintiffs allege that a voter registration form previously used by the State Board was noncompliant with HAVA because it did not clearly indicate that an applicant—unless she lacked either number—was required to list her driver's license number or the last four digits of her social security number. North Carolina's previous voter registration form instructed applicants, "if you have a NC driver license or non-operator's identification number, provide this number. If you do not have a NC driver license or ID card, then provide the last four digits of your social security number." J.A. 427. The form contained fields for applicants to enter both numbers. While the form stated that "fields in red text

13

are required," the fields for the driver's license and social security numbers were not in red text. J.A. 426.

In response to a complaint about this discrepancy, the State Board updated its form to mark the driver's license number and social security number fields in red text. Plaintiffs contend that 225,000 people, including "possible non-citizens" and other ineligible voters, registered to vote using the previous form. J.A. 23. Plaintiffs allege that the State Board was required to strike these ineligible voters from the North Carolina voter rolls and refused to do so.

Plaintiffs allege that the State Board's conduct violated two provisions of HAVA, infractions that in turn constitute two violations of North Carolina state law. The first HAVA provision, Subsection (a)(5)(A), sets forth requirements states must follow when *registering* voters. The second HAVA provision, Subsection (a)(2)(A), establishes states' obligations in *maintaining* their voter rolls. This provision requires state election officials to "perform list maintenance with respect to the computerized list on a regular basis." HAVA Subsection (a)(2)(A). Count One of Plaintiffs' Complaint alleges a violation of North Carolina General Statutes Section 163.82-11(c) (hereinafter "the North Carolina statute"), which requires "[t]he State Board of Elections [to] update the statewide computerized voter registration list and database to meet the requirements of [HAVA]." Count Two asserts that the State Board violated the Equal Protection Clause of the North Carolina Constitution, Article 1 § 19, through HAVA violations that "open[ed] the door to potential" vote dilution. J.A. 40.

14

IV. Analysis

A. The District Court Possessed Federal Question Jurisdiction Over Count Two

We first evaluate whether Count Two, though brought under state law, contains an embedded federal question giving rise to federal jurisdiction under Section 1331. In the "vast bulk of suits" involving the exercise of federal jurisdiction under Section 1331, "federal law creates the cause of action." *Gunn v. Minton*, 568 U.S. 251, 257 (2013). Certain claims brought under state law, however, also fall within the scope of federal question jurisdiction. The Supreme Court has established that "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.* at 258 (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313-14 (2005)).

The district court held that Count One satisfied all four *Gunn* factors. It then "assume[d] without deciding" that Count Two met the first three requirements. J.A. 575. The district court held, however, that federal jurisdiction did not lie over Count Two because of the fourth *Gunn* factor. In the view of the district court, the federal issue implicated by Count Two could not be resolved in federal court without disrupting the federal-state balance. J.A. 575 (quoting *Gunn*, 568 U.S. at 258).

We conclude that the district court was correct in its assumption that Count Two satisfied the first three *Gunn* factors for the same reasons as Count One. We disagree, however, with its conclusion regarding the fourth factor. Because we find that Count Two satisfies all four *Gunn* factors, we hold that the district court possessed original jurisdiction

over Count Two under Section 1331. As a result, removal of Count Two pursuant to Section 1441 was proper.

### 1. Necessarily Raised

Looking to the first *Gunn* factor, the district court had no difficulty concluding that Count One "necessarily raises an issue of federal law." J.A. 577. The court explained:

> "To prevail on [the] claim," Plaintiffs "must show that" Defendants failed to comply with Section 303(a) of HAVA. *Gunn*, 568 U.S. at 259. "That will necessarily require application of [HAVA] to the facts of [Plaintiffs'] case." *Id*. In other words, whether Defendants violated HAVA is "an essential element" of Plaintiffs' state law claim. *Grable*, 545 U.S. at 315; *see also* N.C.G.S. § 163-82.11(c). And "the claim's very success depends on giving effect to a federal requirement." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 384 (2016). The court finds the first factor is met.

J.A. 577.

This analysis applies to Count Two with equal force. Plaintiffs' state constitutional theory runs squarely through HAVA. Under the theory articulated in the Complaint, determining whether the State Board violated HAVA is necessary and essential to the resolution of Plaintiffs' state constitutional claim. The federal questions essential to resolving Plaintiffs' state constitutional claim are the same questions that the district court found necessary to the resolution of Plaintiffs' now-dismissed state statutory claim: (1) did North Carolina's previous voter registration form violate HAVA Subsection (a)(5)(A); and (2) if so, did the "list maintenance" mandated by HAVA Subsection (a)(2)(A) include a requirement that the State Board remove voters who registered to vote using a form that violated HAVA Subsection (a)(5)(A)?

Count Two of Plaintiffs' Complaint begins as follows: "Defendants have a non-discretionary, statutory duty to maintain the state's voter rolls in a manner compliant with Section 303(a) of HAVA." J.A. 39. The Complaint then states that the North Carolina statute is "an affirmative command, creating a duty imposed by law." *Id.* As discussed more fully below, the North Carolina statute does nothing more than require the State Board to "meet the requirements of [S]ection 303(a) of [HAVA]." N.C. Gen. Stat. § 163-82.11(c). Count Two also states that the State Board admitted they failed to uphold this duty, namely, the duty to comply with HAVA, "when they accepted hundreds of thousands of voter registrations which were plainly non-compliant with Section 303(a) of HAVA." J.A. 39. The Complaint further asserts that "[d]espite this admission, Defendants refuse to take any action to remedy their violations" of HAVA and the North Carolina statute. J.A. 40.

Plaintiffs' requests for relief make it abundantly clear that Count Two turns entirely on a determination of the requirements of HAVA. First, Plaintiffs seek "a writ of mandamus and a mandatory injunction ordering Defendants to develop, implement, and enforce practices and policies *to ensure compliance with HAVA.*" *Id.* (emphasis added). Second, they request "a court-approved plan" that would direct Defendants "to remedy" their alleged violations of HAVA. *Id.* This plan would, where necessary, "require all individuals *who failed to provide necessary HAVA identification* information but were still registered to vote under the state's prior registration form, to cast a provisional ballot in upcoming elections pending Defendants' receipt and *confirmation of the required HAVA information.*" J.A. 40-41 (emphases added). Finally, Plaintiffs ask the court to direct

Defendants to take all actions necessary to ensure future compliance with HAVA.  J.A. 41.

All three requests for relief, if granted, would require the court to mandate compliance with

HAVA.

In sum, Count Two alleges that the State Board violated the North Carolina state

constitution by (1) violating HAVA, (2) violating a state statute requiring them not to violate

HAVA, and (3) failing to remedy their violations of (1) and (2). The Complaint contains no

articulation of a state constitutional violation separate and apart from an alleged HAVA

violation. This is a state cause of action in name only.

Plaintiffs requested relief also presents a potential conflict with the 90-day "quiet

period" contained in Section 8(c) of the NVRA. The 90-day quiet period requires that:

> A State shall complete, not later than 90 days prior to the date of a primary
> or general election for Federal office, any program the purpose of which is
> to systematically remove the names of ineligible voters from the official lists
> of eligible voters.

52 U.S.C. § 20507(c)(2)(A). The 90-day quiet period prohibits systematic removal

programs "90 days before an election because that is when the risk of dis[en]franchising

eligible voters is the greatest." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir.

2014).

Plaintiffs filed their Complaint 74 days before the November federal election—well

within the NVRA's proscribed 90-day quiet period. North Carolina has a unified

registration system for both state and federal elections, and thus is bound by the provisions

of the NVRA for the registrants at issue here. *See* N.C. Gen. Stat. § 163-82.11(a)

(establishing "a statewide computerized voter registration system" to "serve as the single system for storing and managing the official list of registered voters in the State").

Without weighing whether the relief requested by Plaintiffs runs afoul of the 90-day quiet period, at a minimum the NVRA poses a threshold federal question that must be answered before Plaintiffs can prevail on their claim. The district court correctly noted that Plaintiffs could not succeed unless a court first accepted Plaintiffs' theory that "the NVRA's restrictions on removals only appl[y] to valid registrants, and individuals who registered to vote in a manner inconsistent with HAVA are not valid registrants." J.A. 580.

That the 90-day quiet period in the NRVA could altogether foreclose Plaintiffs' requested relief only serves to bolster the conclusion that Plaintiffs' claims necessarily raise an issue of federal law. Plaintiffs' theory of Count Two, like their theory of Count One, turns entirely on alleged violations of HAVA Subsections (a)(2)(A) and (a)(5)(A). Accordingly, Count Two satisfies the first *Gunn* factor because it "necessarily raises an issue of federal law."

### 2. Actually Disputed

The second *Gunn* factor looks to whether the federal issue is "actually disputed." In analyzing this factor in the context of Count One, the district court found that Defendants "effectively conceded a violation of [HAVA Subsection (a)(5)(A)]" by admitting that the previous voter registration form created the risk of confusion and error. J.A. 578. As a

19

result, the district court concluded that a HAVA Subsection (a)(5)(A) violation was "undisputed."[3] *Id.*

The district court held, however, that Count One hinged on the meaning of a different sub-provision of HAVA—Subsection (a)(2)(A). In the district court's view, "Plaintiffs in theory could have attempted to articulate a violation of [the state statute] that rested *solely* on Defendants' registration of voters in a manner out of compliance with HAVA [Subsection (a)(5)(A)]. But Plaintiffs are the masters of their Complaint and that is not the theory that they alleged." J.A. 579 n.5 (emphasis in original).

Instead, Plaintiffs allege in their Complaint that the State Board violated the North Carolina statute providing that "[t]he State Board of Elections shall *update* the statewide computerized voter registration *list and database* to meet the requirements of [S]ection 303(a) of the Help America Vote Act of 2002." N.C. Gen. Stat. § 163-82.11(c) (emphasis added). Under the theory outlined in the Complaint, the State Board violated North Carolina state law through its failure to comply with HAVA's "list maintenance" requirements by refusing to remove certain voters from the voter rolls, not through the initial use of an allegedly defective form. As a result, the question critical to Plaintiffs' state statutory claim was whether the "list maintenance" mandated by HAVA included a requirement that the State Board remove voters who registered using a flawed form.

---

[3] We are not convinced that Defendants conceded to a violation of HAVA, but we need not reach that issue.

Defendants argue that HAVA Subsection (a)(2)(A) actually *prohibits* them from removing the voters in question rather than requiring them to do so. HAVA permits state officials to remove a registered voter from a registration list only in accordance with certain "provisions of the National Voter Registration Act of 1993." J.A. 508; HAVA Subsection (a)(2)(A). The NVRA, in turn, limits the circumstances under which "the name of a registrant may . . . be removed from the official list of eligible voters." 52 U.S.C. § 20507(a). As the district court noted, "those defined circumstances do not include a voter's failure to initially register to vote in compliance with [HAVA Subsection (a)(5)(A)]." J.A. 579.

Plaintiffs assert that the meaning of "registrant" within the NVRA is implicitly limited to *valid registrants*—a category excluding those who registered under North Carolina's previous form. Thus, according to Plaintiffs, the NVRA presents no barrier, and the "list maintenance" required by HAVA Subsection (a)(2)(A) includes removing those voters. J.A. 580.

Because the district court found that the North Carolina statute lacked a private right of action, it declined to resolve the dispute concerning the parties' competing interpretations of HAVA Subsection (a)(2)(A) and, in turn, the meaning of the term "registrant" within the NVRA. The district court recognized, however, that the Plaintiffs' statutory claim under the North Carolina statute turned on a *disputed* issue of federal law— the meaning of HAVA Subsection (a)(2)(A):

> Like in *Grable*, the meaning of . . . HAVA is "an essential element" of
> Plaintiffs' claim under [N.C. Gen. Stat.] Section 163-82.11. *Grable*, 545 U.S.
> at 315. This question of federal law "requires resolution," *Franchise Tax Bd.*,

21

463 U.S. at 13, and "is the central point of dispute," *Gunn*, 568 U.S. at 259. Because Plaintiffs' state law claim "really . . . involves a dispute" concerning the "construction, or effect," of a federal law, *Shulthis* v. *McDougal*, 225 U.S. 561, 569 (1912).

J.A. 580-81.

The federal issue—whether defendants violated HAVA Subsection (a)(2)(A)—is "actually disputed." This is equally true for Count Two as it was for Count One. "[I]ndeed, on the merits, it is the central point of dispute." *Gunn*, 568 U.S. at 259. The district court aptly noted that, even if Defendants conceded a violation of HAVA Subsection (a)(5)(A), whether Defendants violated HAVA Subsection (a)(2)(A) remains in contention.

We note that this court recently rejected a theory of statutory construction closely resembling Plaintiffs' argument in this case. Plaintiffs contend that the NVRA, in limiting the circumstances in which "the name of a *registrant* may . . . be removed from the official list of eligible voters," 52 U.S.C. § 20507(a), implicitly qualified the word *registrant* to refer only to *valid registrants*.

In *Virginia Coalition for Immigrant Rights v. Beals*, this court declined to adopt a construction of the NVRA that added an implicit modifier to the word "registrant." Case No. 24-2071, at 3-4 (4th Cir. Oct. 27, 2024), ECF No. 22. We stated, "Appellants' proposed interpretation appears to violate another bedrock principle of statutory interpretation—this time, the plain-meaning rule—by reading 'registrant' in [NVRA] subsection (a)(3) as meaning something other than 'one that registers or is registered' to vote." *Id. Virginia Coalition* casts serious doubt on Plaintiffs' theory of statutory interpretation. That is a merits issue, however, that lies beyond the scope of this appeal. For the purpose of

analyzing the second factor of the *Gunn* test, it is enough to note that parties certainly dispute whether a HAVA Subsection (a)(2)(A) violation occurred.

### 3. Substantial

The third *Gunn* factor asks whether the federal issue is "substantial." The substantiality inquiry looks to "the importance of the issue to the federal system as a whole." *Gunn*, 568 U.S. at 260. Here, we confront whether HAVA (and, by extension, the NVRA) issues presented by Count Two implicate substantial federal interests. As framed by the district court:

> Distilled to its essence, this case concerns whether or not a state may, or in fact must, remove a registered voter from a voting roll shortly before a national election or require that voter to cast a provisional ballot because that voter (through no apparent fault of their own) was initially registered to vote in a manner inconsistent with federal law.

J.A. 581. We have no hesitation concluding that this issue is of substantial importance "to the federal system as a whole." *Gunn*, 568 U.S. at 260. "It is beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). At the same time, confirming that all voters are eligible is of great national importance. "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

23

This case stands in stark contrast to *Gunn*. The patent dispute in *Gunn* was "backward-looking" and "hypothetical," 568 U.S. at 261, and any potential preclusive effect of the state court's ruling "would [have] be[en] limited to the parties and patents that had been before the state court." *Id.* at 263. This case, on the other hand, requires a prospective interpretation of what HAVA and the NVRA require. The desired remedy is forward-looking, and it would concretely impact 225,000 North Carolina voters. A state court ruling could very much change how *federal* law is enforced for this *federal* election and in future elections.

We readily agree with the district court's conclusion that "[t]here is a substantial federal interest in protecting the right to vote and in ensuring the integrity of elections." J.A. 581. Where the answer to a question of federal law could potentially determine whether nearly a quarter-of-a-million voters may have their ballots counted in a federal election, it is one of substantial federal importance.

### 4. *Federal-State Balance*

Turning to the fourth and final *Gunn* factor, which the district court found dispositive, we consider whether the exercise of federal jurisdiction over Count Two would "disrupt[] the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. This factor asks us to evaluate whether hearing Count Two in federal court will "attract[] a horde of original filings and removal cases raising other state claims" or "portend only a microscopic effect" on "the normal currents of litigation." *Grable,* 545 U.S. at 315, 318-19.

We disagree with the district court's conclusion that exercising federal jurisdiction over Count Two would open the floodgates to a wave of state constitutional litigation in

federal court. Just as *Grable* found that "it will be the rare state title case that raises a contested matter of federal law," *id.* at 315, we conclude that it will be the rare state equal protection case that turns on a violation of HAVA or the NVRA. In fact, we are aware of no other state constitutional case similar to this one, and Plaintiffs have pointed to none.

Plaintiffs' Count Two claim may come cloaked in state constitutional garb, but it raises only federal statutory questions.[4] Here, the alleged state constitutional claim necessarily turns on the contested interpretation of provisions of federal laws, HAVA and the NVRA. The viability of the state constitutional claim depends, therefore, on a court's adopting Plaintiffs' preferred reading of two federal statutes.

As the district court recognized, consideration of HAVA's overall statutory scheme "leads to the conclusion that Congress intended for federal courts to resolve core questions of statutory interpretation." J.A. 591. HAVA authorizes the Attorney General to enforce compliance with its requirements "*in an appropriate United States District Court.*" HAVA § 21111 (emphasis added). We are confident that Congress did not intend to prevent federal courts from deciding cases where the sole issue, the interpretation of a federal statute, may determine who can vote in a federal election. The mere invocation of a state constitutional provision does not unsettle that conclusion.

---

[4] Indeed, plaintiffs likely brought this claim under the state constitution precisely because no federal cause of action lies for a generalized claim of "vote dilution" like the one asserted here. *See Wood v. Raffensperger*, 981 F.3d 1307, 1314-15 (11th Cir. 2020) (explaining that a vote dilution claim "is a 'paradigmatic generalized grievance that cannot support standing.'"). This court has consistently rejected end-runs around federal jurisdiction where "a congressional act forms the basis of the plaintiffs' complaint." *Bauer v. Elrich*, 8 F.4th 291, 297-98 (4th Cir. 2021).

25

Because we find that Count Two satisfies all four *Gunn* factors, we hold that the district court possessed federal question jurisdiction over Count Two under Section 1331. As a result, removal of Count Two pursuant to Section 1441 was proper. Having concluded that the district court possessed original jurisdiction over Count Two, we need not consider whether it abused its discretion in declining to exercise supplemental jurisdiction over that claim.

B. Removal Was Proper Under Section 1443(2)

Removal of Count Two was also proper under Section 1443(2). That provision allows for removal of cases by a defendant who is "refusing to do any act on the ground that it would be inconsistent with" the defendant's "authority derived from any law providing for equal rights." 28 U.S.C. § 1443(2). The State Board, in its notice of removal, grounded its refusal to strike people from voting rolls within 90 days of an election "on [its] obligation to comply with 52 U.S.C. § 10101(a)(2) and 52 U.S.C. § 20507(c)(2)(A)." Notice of Removal at 2, J.A. 8. These provisions "provid[e] for equal rights" within the meaning of Section 1443(2).

The Supreme Court has limited the scope of Section 1443. In *Georgia v. Rachel*, the Court held that "the phrase 'any law providing for equal civil rights' must be construed to mean any law providing for specific civil rights stated in terms of *racial* equality." 384 U.S. 780, 792 (1966) (emphasis added). Contrary to the district court's remand order, however, this case meets *Rachel*'s standard for removal under Section 1443. The relevant provisions of the Civil Rights Act and the NVRA expressly protect rights "stated in terms of racial equality." *Id.*

26

The first provision upon which Defendants based removal, Section 10101(a)(2), was enacted as Title I of the Civil Rights Act of 1964. The subsection relevant to the State Board's refusal to strike individuals from voter rolls is known as the Materiality Provision of the Civil Rights Act. It provides that:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B).

As the Third Circuit explained, the Materiality Provision was "part of Congress' effort to 'outlaw[s] some of the tactics' used by States 'to disqualify [African Americans] from voting in federal elections.'" *Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 126 (3d Cir. 2024) (alteration in original) (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966)). "One of the many techniques used to keep Black voters from the polls was to reject would-be registrants for insignificant, hyper-technical errors in filling out application forms." *Id.* (citing Report of U.S. Comm'n on Civil Rights 1963, at 22). The Materiality Provision is contained in a section entitled "Race, color, or previous condition not to affect right to vote; uniform standards for voting qualifications; errors or omissions from papers." 52 U.S.C. § 10101(a). That section of the Civil Rights Act further provides that "[a]ll citizens of the United States who are otherwise qualified by law to vote . . . shall be entitled and allowed to vote . . ., without distinction of race, color, or previous condition of servitude." *Id.*

The district court held that the Materiality Provision of the Civil Rights Act of 1964 was not a law "providing for specific civil rights stated in terms of racial equality," *Rachel*, 384 U.S. at 792, because the provision itself "does not mention race" and is "phrased in terms of general application available to all persons." J.A. 593. This reading is far too formalistic.[5] The Supreme Court's decision in *City of Greenwood v. Peacock*, 384 U.S. 808 (1966), a companion case to *Rachel*, cuts against a narrow reading of what constitutes a law providing for racial equality. In *Peacock*, the Supreme Court stated that a "precise definition of the limitations of the phrase 'any law providing for . . . equal civil rights' in § 1443(1) is not a matter we need pursue . . . because . . . at least the two federal *statutes* specifically referred to in the removal petitions, 42 U.S.C. § 1971 and 42 U.S.C. § 1981, do qualify under the statutory definition [of Section 1443(1)]." *Id.* at 825 (emphasis added). The Court referred to its description of these statutes, which included a citation to § 1971(b), which makes no express mention of race. *Id.* at 811 n.3. The text formerly incorporated in 42 U.S.C. Section 1971(b) is now codified at Section 10101(b).

---

[5] Other courts have likewise rejected this narrow reading, instead considering the Congressional act as a whole to determine whether certain provisions fall within Section 1443. The Fifth Circuit held that removal based on 52 U.S.C. § 10307(b), part of the Voting Rights Act, was proper, by looking at that Act more broadly, including its lead provision. *Whatley v. City of Vidalia*, 399 F.2d 521, 525-26 (5th Cir. 1968). The United States District Court for the District of Connecticut explained that, where a provision is "numbered among the laws collectively referred . . . as 'any law providing for . . . equal civil rights," removal is proper. *New Haven Firefighters Local 825 v. City of New Haven*, 120 F. Supp. 3d 178, 184 (D. Conn. 2015) (upholding removal because 42 U.S.C. § 2000e-3(a), which was a provision barring retaliation under Title VII, was part of the Civil Rights Act). The United States District Court for the Southern District of New York found removal proper where the law at issue was § 4(e) of the Voting Rights Act. *O'Keefe v. N.Y.C. Bd. of Elections*, 246 F. Supp. 978, 979-80 (S.D.N.Y. 1965).

*Rachel* and *Peacock* do not require us to wear blinders when reading subsections of the Civil Rights Act. It would be a stunning conclusion to hold that the Materiality Provision and similar sections of the Civil Rights Act of 1964 are not laws providing for racial equality. Indeed, Section 1443 and the accompanying exception to Section 1447's general bar on appellate review of remand orders were passed alongside Section 10101 in the Civil Rights Act of 1964. Considering the context of the Civil Rights Act of 1964, as well as the history of discriminatory voting practices motivating the provision's passage, we are left with no doubt that the Materiality Provision is a law protecting against racially discriminatory voting practices and "providing for equal rights" within the meaning of Section 1443(2).

The provision of the NVRA establishing a 90-day quiet period is also a law providing for racial equality. 52 U.S.C. § 20507(c)(2)(A). That provision requires states to "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." *Id*. Congress adopted the NVRA in part to address "discriminatory and unfair registration laws and procedures [that] can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a).

The NVRA's legislative history confirms that Congress enacted the act, and the 90-day quiet period in particular, for the express purpose of combating racial discrimination. "Several witnesses at the [committee] hearings in the 102d Congress testified that

registration procedures in the United States are not uniform and that discriminatory and restrictive practices that deter potential voters are employed by some States." S. Rep. 103-6, at 3 (1993). The Senate Report explained that while "[t]he Voting Rights Act of 1965 made most of these restrictive practices illegal," "discriminatory and unfair practices still exist and deprive some citizens of their right to vote." *Id.* It then warned that voter purge processes "must be structured to prevent abuse which has a disparate impact on minority communities. Unfortunately, there is a long history of such list cleaning mechanisms which have been used to violate the basic rights of citizens." *Id.* at 18. The Report made clear that certain provisions, including the 90-day limitation at issue here, "were added to prevent the discriminatory nature of periodic voter purges, which they assert appear to affect [B]lacks and minorities more than others."[6] *Id.* at 20.

The text of the NVRA, including its lead provision, reveals that it is a law "providing for specific civil rights stated in terms of racial equality." *Rachel*, 384 U.S. at 792. Defendants' reliance on NVRA, like the Materiality Provision of the Civil Rights Act, provides a proper basis for removal under Section 1443(2).

## V. Conclusion

We hold that remand of Count Two to North Carolina state court was improper. At issue is a substantial question of federal law, the resolution of which is appropriately

---

[6] Also relevant is the reality that North Carolina has a "history of voting-related discrimination" against racial minorities "that dates back to the Nation's founding." *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 244-45 (4th Cir. 2014) (quotation marks omitted).

decided by the federal courts because it respects the federal-state balance envisioned by Congress and HAVA itself. The district court possessed original jurisdiction over Count Two pursuant to Section 1331, and Count Two was properly removed to federal court under Section 1441. We further conclude that removal was proper under Section 1443 because both the Civil Rights Act of 1964 and the NVRA are laws "providing for equal rights."

*       *       *

The judgment of the district court is reversed, and the case is remanded for proceedings consistent with this opinion.

IT IS SO ORDERED.

31

DIAZ, Chief Judge, concurring:

I join the majority's thoughtful opinion but write separately to comment on the plaintiffs' Article III standing—a threshold showing that they have made by the barest of threads.

This lawsuit began in state court before being removed quickly to federal court. That removal should have prompted a fundamental jurisdictional question:  Does the plaintiffs' complaint plead the necessary Article III standing "to get in the federal courthouse door[?]"  *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024).

The district court's opinion didn't consider this issue.  Yet a plaintiff must meet this "bedrock constitutional requirement" in all cases.  *Id.* at 378 (cleaned up).  This showing is particularly important when political organizations try to vindicate the rights of individual voters mere weeks before a national election (and when early voting has already begun).  And it's a showing that we must satisfy ourselves of, despite the odd procedural posture of this case.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (stating that federal courts have an "independent obligation to assure standing exists [even if not] challenged by any of the parties").

32

While ultimately I'm satisfied—again, just barely—by the plaintiffs' showing at the pleading stage, I highlight recent developments in the law that expose the perils in relying on bare allegations and buzzwords to prove standing.[1]

I.

To first summarize the facts here: the Republican National Committee ("RNC") and the North Carolina Republican Party filed a two-count complaint in North Carolina state court. The suit claims that the defendants' alleged failure to collect certain information—either a person's driver's license number or the last four digits of their social security number—before registering that person to vote, violated the Help America Vote Act of 2002 (and, by extension, a North Carolina statute mandating compliance with the Act) and the North Carolina Constitution. After the defendants removed the case to federal court, the plaintiffs moved to remand.

To state the obvious then, the plaintiffs don't want to be here. Their complaint does, however, allege that they had organizational and associational standing to sue in state court. But with the case now in federal court, the question is whether the allegations are enough to support Article III standing.

---

[1] This case is admittedly an odd vehicle to robustly analyze Article III standing. We're reviewing an appeal of a remand order after the case was removed from state court. At oral argument, that posture left the defendants arguing for the plaintiffs' Article III standing, and the plaintiffs sheepishly suggesting that they hadn't pleaded enough to stay in federal court.

33

A.

Any plaintiff appearing in federal court—whether an individual or organization—must show three things to establish standing: "(1) [they] suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 619–20 (4th Cir. 2018) (cleaned up).  An organization may do so in two ways, either "in its own right to seek judicial relief for injury to itself," or "as a representative of its members who have been harmed." *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md., Inc.*, 843 F. App'x 493, 495 (4th Cir. 2021) (citing *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013)).  We call the former organizational standing, and the latter associational or representational standing.  *See id.*; *see also N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 301 (4th Cir. 2020).

In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the Supreme Court explained that an organization pleads an injury-in-fact if it shows that a defendant's acts "perceptibly impaired" the organization's activities and caused a "consequent drain on the organization's resources." *Id.* at 379.  Even under that standard, however, the organization must show "far more than simply a setback to [its] abstract social interests." *Id.*

But this year in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), the Court tightened its standing analysis, clarifying that *Havens Realty* was "an unusual case," *id.* at 396, that doesn't support the "expansive theory" that "standing exists when an organization diverts its resources in response to a defendant's

34

actions," *id.* at 395.  Rather, the Court reinforced that, as for an individual plaintiff, an organization's harm must be "concrete," meaning "real and not abstract," and "particularized," affecting that organization in "a personal and individual way," *id.* at 381 (cleaned up), to prevent organizations from "roam[ing] the country in search of government wrongdoing," *id.* at 379 (cleaned up).

In other words, "Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381.  An organization couldn't show standing simply because it "believes that the government is acting illegally" or "based only on an asserted right to have the [g]overnment act in accordance with law."  *Id.* (cleaned up).  Standing, said the Court, requires more.

Applying these principles, the Court in *Alliance for Hippocratic Medicine* rejected the medical association-plaintiffs' arguments that they showed an injury-in-fact.  Broadly speaking, the pro-life medical associations challenged the lawfulness of the FDA's decision to approve mifepristone, a medication used to, among other things, terminate pregnancies, as well as the agency's later decisions to relax certain requirements around the use of mifepristone.  *Id.* at 375–76.

The organizations asked the Court to enjoin the FDA's approval of the drug, in effect removing it from the market.  But because the organizations didn't "prescribe or use mifepristone" and weren't otherwise required by the FDA's actions "to do anything or to refrain from doing anything," they had to resort to "several complicated causation theories to connect FDA's actions to [their] alleged injuries in fact."  *Id.* at 385–86.

The organizations alleged that the FDA's decisions had "impaired their ability to provide services and achieve their organizational missions," *id.* at 394 (cleaned up), which caused them to "incur[] costs to oppose [defendant's] actions," *id.* They claimed that they had to "conduct their own studies . . . [to] better inform their members and the public" about mifepristone; they had been "forced" to "expend considerable time, energy, and resources" to draft petitions in opposition to the FDA; and they had to "engag[e] in public advocacy and public education," all of which had "caused the associations to spend considerable resources to the detriment of other spending priorities." *Id.* (cleaned up).

The Court, at each turn, was unimpressed.

Not mincing words, the Court held that "an organization that has not suffered a concrete injury caused by a defendant's actions cannot spend its way into standing," nor can it "manufacture" standing merely by "expending money to gather information and advocate against the defendant's action." *Id.* Endorsing "that theory would mean that all organizations in America would have standing to challenge almost every [government] policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* at 395.

Instead, the Court summarized the critical standard from *Havens Realty*: a plaintiff must show that a defendant's "actions directly affected and interfered with [the plaintiff's] core business activities." *Id.*

B.

In recent weeks, a trio of district courts confronted with election-related cases have embraced what is, in my mind, an appropriately stricter view of organizational standing.

36

*See, Republican Nat'l Comm. v. Benson*, — F. Supp. 3d —, 2024 WL 4539309, at *10–12 (W.D. Mich. Oct. 22, 2024); *Republican Nat'l Comm. v. Aguilar*, No. 2:24-cv-00518, 2024 WL 4529358, at *6–8 (D. Nev. Oct. 18, 2024); *Strong Cmtys. Found. of Ariz. Inc. v. Richer*, No. CV-24-02030, 2024 WL 4475248, at *8–10 (D. Ariz. Oct. 11, 2024).  In each case, political groups claimed that (1) they had to divert resources because of some alleged failure by the defendant to conform with a voting regulation, or (2) their members would be injured because their votes would be diluted, or because they would lose confidence in the integrity of elections.  And in each case, the court found these injuries wanting.

In *Republican National Committee v. Benson*, for example, the court found that the RNC's proffered injuries described "activities in which the RNC normally engages" or "only a speculative harm to which resources might be devoted."  2024 WL 4539309, at *11.  The court remarked that the "allegations [did] not describe a personal stake in the outcome of a controversy as to warrant invocation of federal-court jurisdiction." *Id.* at *12; *see also Richer*, 2024 WL 4475248, at *9 (explaining that an organization "must show that a challenged governmental action directly injures the organization's pre-existing core activities and does so *apart* from the plaintiffs' response to that governmental action" (cleaned up)); *Aguilar*, 2024 WL 4529358, at *7 ("[V]ague allegations of shifting resources," where plaintiff shifted "some resources from one set of pre-existing activities in support of their overall mission to another, new set of such activities," "fail[ed] to

provide the court any information regarding what or which resources the organizational plaintiffs have needed to shift." (cleaned up)).[2]

So too did these courts reject general theories of vote dilution or damage to election integrity in the associational standing context, as either not particularized or overly speculative. For either individual or organization plaintiffs, "the mere fact that some invalid ballots have been inadvertently counted, without more, does not suffice to show a distinct harm to any group of voters *over any other*." *Richer*, 2024 WL 4475248, at \*8 (emphasis added).

Rather, this harm "is the type of generalized grievance common to all [of a state's] residents," which doesn't affect any one plaintiff "in a personal and individual way." *Benson*, 2024 WL 4539309, at \*9 (cleaned up); *see also Aguilar*, 2024 WL 4529358, at \*4 ("[An individual]'s fear of vote dilution can be raised by every and any voter in the [s]tate."). The same is true for vague handwaving about election integrity. *See Aguilar*, 2024 WL 4529358, at \*5 ("[A plaintiff]'s undermined confidence in the integrity of [a state's] elections is not an injury that is distinct from that of any other registered voter.").

And as one district court explained, the harm is also speculative, "requir[ing] three uncertain intervening events: (1) an ineligible voter must be afforded the opportunity to

---

[2] *Cf. Republican Nat'l Comm. v. Wetzel*, — F. Supp. 3d —, 2024 WL 3559623, at \*5 (S.D. Miss. July 28, 2024) (finding standing based on several detailed declarations and affidavits where plaintiff-organizations described injuries that were "specific to each party" and not based on routine activities, so that those plaintiffs had "a direct stake in the outcome of this lawsuit"), *rev'd on other grounds*, No. 24-60395, 2024 WL 4579307 (5th Cir. Oct. 25, 2024).

commit fraud; (2) the ineligible voter will in fact commit fraud; and (3) the fraud will not

be prevented." *Id.* (disagreeing with *Green v. Bell*, No. 3:21-cv-00493, 2023 WL 2572210

(W.D.N.C. Mar. 20, 2023)).  Indeed, "[c]ourts have widely concluded that an alleged injury

related to a lack of confidence in a voting system is too speculative to establish an injury

in fact, and therefore standing."  *Id.* at *6 (cleaned up) (citing cases).

C.

Given this new legal landscape, the plaintiffs' toes are just over the finish line for

organizational standing, but they're stuck at the starting gate for associational standing.

The plaintiffs plead that they have organizational standing because the defendants'

"actions and inaction *directly impact* [*their*] *core organizational missions* of election

security and providing services aimed at promoting Republican voter engagement and

electing Republican candidates for office."  J.A. 26 ¶ 15 (emphasis added).  They claim

that they've had "to divert significantly more of their resources into combatting election

fraud in North Carolina," so their "organizational and voter outreach efforts"—which, for

the RNC, are on a national scale—"have been and will continue to be significantly stymied

due to [d]efendants' ongoing failures."  J.A. 26 ¶ 15.  "As a result," allege plaintiffs, they

"will have no choice but to expend increased amounts of time and money, beyond what

they would have already spent, in order to combat this unwarranted interference with their

central activities," such as "monitoring North Carolina's voter rolls, voter activity, and

responding to instances of potential voter fraud in upcoming elections."  J.A. 26 ¶ 15.

Some of these allegations are the sort of vague and attenuated grievances that (as

some district courts have found) no longer cut it to show standing.  But the plaintiffs have

39

at least alleged—however improbably—that the defendants' actions and inactions have impaired their core business activities.

Even so, the plaintiffs' showing for associational standing falls woefully short. The plaintiffs allege that their "members are harmed by . . . inaccurate voter rolls," so that their "members' votes are undoubtedly diluted due to ineligible voters participating in elections." J.A. 26–27 ¶ 16. And (they allege) "these members' rights to participate in a fair and secure electoral process, free from voter fraud, will be significantly hindered." J.A. 27 ¶ 16. But under Supreme Court and our precedent, a plaintiff's harm must be concrete, it must be imminent, and it must be particularized.[3] The plaintiffs' voter dilution claim is not: it reaches every North Carolina voter, even if they're not the plaintiffs' preferred ones.[4]

## II.

As if repeating family lore, the Supreme Court in *Alliance for Hippocratic Medicine* quoted Justice Scalia's first question for a plaintiff trying to open the federal court doors: "What's it to you?" 602 U.S. at 379. For these plaintiffs, on these facts (and perhaps against their best wishes), the answer is: "Barely enough."

---

[3] That's not to say that individual voters wouldn't have standing to challenge some actions that affect a large number of voters. For example, individual voters that have been removed from the voter rolls or are at risk of being removed from the voter rolls could, with appropriate pleading, state an injury-in-fact stemming from election officials' actions. *E.g.*, *Va. Coal. for Immigrant Rts. v. Beals*, No. 24-2071 (4th Cir. Oct. 27, 2024).

[4] In other voting contexts, such as gerrymandering, a theory of vote dilution may be sufficient to support standing. *See Rucho v. Common Cause*, 588 U.S. 684, 693 (2019).

40